2003-NMCA-055

65 P.3d 1099

**Steve MILLER and Diane Miller, Plaintiffs,**

v.

**TRIAD ADOPTION AND COUNSELING SERVICES, INC., Choices Adoption and Counseling Services, Inc., and Vonda Cheshire, individually, Defendants/Third–Party Plaintiffs–Appellants,**

v.

**The Reciprocal Alliance (Risk Retention Group), Third–Party Defendant–Appellee.**

No. 22,696.

Court of Appeals of New Mexico.

Feb. 6, 2003.

**546**

R. Alfred Walker Albuquerque, NM, for Appellants.

John M. Brant, Susan B. Fox, Nelse T. Schreck, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, NM, for Appellee.

## OPINION

PICKARD, Judge.

{1} This is an appeal of a summary judgment granted to The Reciprocal Alliance Group (TRA), the third-party defendant-appellee, and against Triad Adoption and Counseling Services (Triad) and Choices Adoption and Counseling Services (Choices), the defendants/third-party plaintiffs-appellants. The trial court held that the language of the insurance policy at issue did not require either coverage or a duty to defend. We affirm.

## FACTS

{2} The history of this case is best described by starting with a chronology of events. On November 27, 1996, Steve and Diane Miller (not parties to this appeal) asserted claims against Triad alleging negligence because of a failed adoption attempt. Although there may have been insurance coverage for the Millers' damages, such coverage was provided to the professional staff of Triad, and not Triad itself. Although apparently aware of this fact, the Millers' attorney did not amend the original suit to include the professional staff.

{3} TRA issued a Professional Liability Occurrence Insurance Policy to Triad with an effective date of February 1, 2000. On February 17, 2000, the trial court found for the Millers in the 1996 claim, and ordered a judgment against Triad. The trial court also determined that the Millers were entitled to costs and reasonable attorney fees, which were awarded later. On February 28, 2000, the Triad board of directors met to discuss the judgment against it. At that meeting, they decided to form a new corporation called Choices Adoption and Counseling Services and leave Triad sitting, inactive, with a judgment against it. On March 6, 2000, TRA issued a Change Endorsement, transferring the policy from Triad to Choices. On July 28, 2000, the Millers filed a complaint against Triad, Choices, and the CEO of both corporations, Vonda Cheshire, to enable them to recover the judgment and awards that Triad had not yet paid, which the Millers calculated to be $63,755.18. The complaint alleged that Triad fraudulently transferred its assets to Choices with the intent to hinder, delay, or defraud the Millers of their judgment, contrary to NMSA 1978, §§ 56–10–18 and – 19(A) (1989). The complaint also alleged successor corporate liability and civil conspiracy.

{4} Pursuant to the policy issued in February 2000, Triad/Choices sought a defense and indemnity from TRA regarding the Millers' July 28, 2000, complaint. TRA Senior Claims Consultant James Kochuk denied both the defense and indemnity, stating that the professional liability policy was an occurrence policy, and the acts in the original lawsuit occurred prior to the inception of the current policy, and were not covered. The factual basis for the claims in the complaint filed on July 28, 2000, did occur during the policy period, but coverage was denied for those claims because the facts alleged by the Millers did not come within the definition of "incident" as defined in the policy, and the damages alleged in the complaint did not arise out of the " 'rendering of or failure to render professional services' " as required by the policy. Therefore, TRA denied a defense in the July 28, 2000, action because the policy provided that TRA had " 'no duty to defend the Insured against any Claim or Suit for Damages to which this Policy does not apply.' " In response to this letter, Triad/Choices' counsel sent a detailed letter to TRA outlining additional facts and law in another request for a defense and for indemnity. The request was again denied, this time in a letter from TRA's counsel. Triad/Choices then filed a third-party complaint against TRA alleging breach of contract, bad faith, and violation of New Mexico Unfair Claims Practices Act for TRA's failure to defend and indemnify Triad/Choices in the Millers' July 28, 2000, lawsuit.

{5} TRA later filed a motion for summary judgment, arguing that it had no duty to defend or indemnify Triad/Choices. Triad/Choices filed a cross-motion for summary judgment seeking a declaration that TRA had a duty to defend and alleging that the issue of indemnification was premature. The trial court granted TRA's motion for summary judgment and denied Triad/Choices' motion for summary judgment. Triad/Choices now appeals the grant of TRA's summary judgment motion and the denial of its summary judgment motion.

{6} Triad/Choices argues that the facts in the July 28, 2000, complaint bring the claims within the coverage of the policy, invoking TRA's duty to defend; that the exclusionary clause cannot be invoked at this point in the proceedings; and that TRA did not make an adequate investigation before refusing to defend and indemnify Triad/Choices against this complaint. We disagree with these arguments and affirm.

## STANDARD AND SCOPE OF REVIEW

{7} Summary judgment is appropriate when there are no issues of material fact and the movant is entitled to judgment as a matter of law. *Gonzales v. Allstate Ins. Co.,* 1996–NMSC–041, 122 N.M. 137, 139, 921 P.2d 944, 946. Since the facts in this case are not disputed, our task is to determine whether the trial court correctly applied the law to the facts. *Id.* We review de novo whether the trial court correctly applied the law to those facts. *Computer Corner, Inc. v. Fireman's Fund Ins. Co.,* 2002–NMCA–054, ¶ 8, 132 N.M. 264, 46 P.3d 1264.

{8} The decision of the trial court was based on its interpretation of the obligations of the insurer as defined in the insurance policy at issue. The obligation of an insurer is a matter of contract law and must be determined by the terms of the insurance policy. *Knowles v. United Servs. Auto. Ass'n,* 113 N.M. 703, 705, 832 P.2d 394, 396 (1992). "An insurance contract should be construed as a complete and harmonious instrument designed to accomplish a reasonable end." *Id.* (internal quotations marks and citation omitted). Unambiguous insurance contracts must be construed in their usual and ordinary sense. *W. Commerce Bank v. Reliance Ins. Co.,* 105 N.M. 346, 348, 732 P.2d 873, 875 (1987). A clause is ambiguous if it is "reasonably and fairly susceptible of different constructions." *Knowles,* 113 N.M. at 705, 832 P.2d at 396 (internal quotation marks and citation omitted). When a clause is ambiguous, it must be construed against the insurance company as the drafter of the policy. *Id.* However, when the language in the policy is unambiguous, "we will not strain the words to encompass meanings they do not clearly express." *Gonzales,* 122 N.M. at 140–41, 921 P.2d at 947–48.

## DISCUSSION

### Duty to Defend

■■■■ {9} The trial court, in granting summary judgment, found that TRA had no duty to defend Triad/Choices in the Millers' lawsuit filed July 28, 2000. An insurer's duty to defend arises out of the nature of the allegations in the complaint. *Bernalillo County Deputy Sheriffs Ass'n v. County of Bernalillo*, 114 N.M. 695, 697, 845 P.2d 789, 791 (1992). The duty to defend is distinct from the duty to indemnify. *Found. Reserve Ins. Co. v. Mullenix*, 97 N.M. 618, 619, 642 P.2d 604, 605 (1982). If the allegations of the complaint or the alleged facts tend to show that an occurrence comes within the coverage of the policy, the insurer has a duty to defend regardless of the ultimate liability of the insured. *Id.* Known but unpleaded facts may bring a claim within the coverage of the policy at the beginning of the litigation or at a later stage. *See Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co.*, 110 N.M. 741, 744, 799 P.2d 1113, 1116 (1990). Accordingly, we must determine whether the allegations in the Millers' complaint combined with the known facts bring the case within the coverage of TRA's insurance policy issued to Triad/Choices.

{10} The Millers' complaint makes three detailed claims against Triad, Choices, and Vonda Cheshire. The first claim, fraudulent transfer, alleges that Triad transferred its assets without receiving value in exchange for the transfer, that the transfer made it insolvent, and that the Millers will therefore be unable to collect their judgment and awards against Triad. The complaint alleges that the fraudulent transfer is a violation of Sections 56–10–18 and –19(A). The second claim, successor corporate liability, alleges that the asset transfer from Triad to Choices was undertaken with the intent and purpose of enabling Triad to avoid its liability to the Millers. Under the fraudulent conveyances doctrine of successor corporate liability or under the "continuation" doctrine of successor corporate liability, the claim is that Choices is liable to the Millers on their judgment and awards against Triad. The complaint alleges that Choices is operated by the same officers, directors, management poli-

cies, and administrative procedures as Triad; occupies the same office location with the same staff, equipment, and client files as Triad; filed for a new license with the Children, Youth and Families Department under the procedure for a corporate name change; and holds itself out to the public as a continuation of Triad. The third claim, civil conspiracy, alleges that Ms. Cheshire conspired with Triad and Choices to accomplish the fraudulent transfer. The complaint alleges that her actions were undertaken with deliberate intent to fraudulently delay, prevent, or hinder the Millers from collecting their judgment and awards from Triad. The complaint alleges that the Millers have suffered financial injury and harm to the extent that they are unable to collect their judgment and awards from Triad or Choices.

{11} The policy at issue is captioned "Professional Liability Occurrence Insurance Policy for Professional Counselors and Human Development Practitioners." Triad/Choices purchased only Coverage A for Professional Liability and not Coverage B for General Liability. The insuring clause of Coverage A states:

> The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as Damages because of Bodily Injury ... [or] Property Damage ... caused by an Incident which occurs during the Policy Period **and** arising out of the rendering of or failure to render professional services on behalf of **and** in the operation of the business or conduct of the profession of the Named Insured as stated in the Declarations. (Emphasis added.)

{12} Triad/Choices argues that after careful parsing of the policy, by its express terms, the facts of the Millers' complaint "potentially" or "arguably" fall within the coverage of the policy. Triad/Choices essentially argues that the Millers' claim for damages falls under the definition for both "bodily injury" and "property damage" as defined by the policy, and that the facts underlying the July 28, 2000, complaint constitute an "incident" as defined by the policy. It argues that the Millers' claim for "damages" also falls within the definition of "damages"

in the policy. We hold that Triad/Choices' arguments are strained interpretations of unambiguous clauses in the context of the entire policy. We address each phrase in turn.

### "Bodily Injury"

{13} The policy defines "bodily injury" as follows:

Bodily Injury means any injury sustained by any person including, but not limited to: (1) psychological injury, harm or impairment, including death at any time resulting therefrom, (2) physical injury, sickness, disease, mental anguish or emotional distress, including death at any time resulting therefrom and (3) loss of consortium or impairment of domestic or personal relations.

Triad/Choices argues that the phrase "any injury sustained by any person including, but not limited to" means that "bodily injury" is any "injury of any kind." Though we are bound to construe ambiguities against the insurer as the drafter of the contract, *Knowles*, 113 N.M. at 705, 832 P.2d at 396, an ambiguity does not exist merely because the parties disagree as to the meaning of a particular word. *Gonzales*, 122 N.M. at 140–41, 921 P.2d at 947–48. Our Supreme Court has determined that, by its plain meaning, "bodily injury" means injury to the physical body. *Id.* at 140, 921 P.2d at 947. "Bodily injury is said plainly to connote harm arising from corporeal contact." 20 Eric Mills Holmes, Holmes' Appleman on Insurance 2d § 129.2, at 30 (2002) (hereinafter "Holmes"). Though the definition in TRA's policy includes psychological injury and loss of consortium, which are not usually included in a definition of "bodily injury," these additional injuries do not broaden the ordinary meaning of "bodily injury" to "any injury." In fact, one may view them as relating to the corporeal body's state, albeit the mental or emotional state. Triad/Choices asks us to ignore the adjective "bodily" in interpreting this clause to mean "any injury," which defies the plain meaning of the word "bodily." Triad/Choices' arguments would also read the word "bodily" out of the policy. We decline to so read the policy, and determine that the financial inju-

ry alleged in the complaint by the Millers is not a "bodily injury."

### "Property Damage"

{14} The policy defines "property damage" as:

1. physical injury to or destruction of tangible property which occurs during the Policy Period, including the loss of use thereof at any time resulting therefrom,

2. loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an Occurrence during the Policy Period, or

3. other loss, whether or not resulting from physical injury or damage to person or property.

Triad/Choices argues that "other loss" includes economic loss, which is normally excluded from a definition of "property damage," and that the Millers' complaint alleges that they will suffer financial loss and injury. We need not decide whether we agree with Triad/Choices that "other loss" includes economic loss. *See* Holmes, *supra*, § 129.2, at 77 ("Even though courts have often determined that damage to intangible property (e.g., investments, lost profits, copyrights, goodwill, and the like) does not constitute 'property damage,' that is not always the case, especially if the focus is on the word 'damage.' "). As we shall see, even if the damage alleged in the complaint may meet the policy definition of "property damage," it is not enough to bring this claim within the coverage of the policy.

### "Incident"

{15} The policy defines "incident" as any "act or omission":

1. in the rendering of or failure to render professional services by the Insured or by any person for whom the Insured is legally responsible, on behalf of and in the operation of the business or conduct of the profession of the Named Insured as stated in the Declarations, or

. . . .

3. in the operation or management of the premises used in the business of the Named Insured stated in the Declarations[.]

. . . .

Any such act or omission together with all related acts or omissions in the furnishing of such services to any one person shall be considered one "Incident" and be subject to the same limit of liability[.]

Triad/Choices argues that there are three ways that the Millers' lawsuit is an "incident" as defined by the policy. Triad/Choices argues that since the Millers allege that Choices has operated from the same office location as Triad and has assumed control over Triad's clients and files, the Millers' claims arise out of "the exertion of power or influence" (which is the dictionary definition of "operation") over the premises and therefore potentially or arguably fall within the definition of "incident." Triad/Choices argues further that since the Millers allege in the complaint that Triad has a fiduciary duty to them, the "rendering of or failure to render professional services" is an act or omission of the operation or management of the premises as the definition of "incident" is described in the policy, and therefore the "incident" of the July 28, 2000, complaint is simply a continuation of the "rendering of or failure to render professional services." Triad/Choices states, "It is certainly 'arguable' that Triad's honoring of its alleged continuing fiduciary duties, arising as they do out of the original professional services contract, is itself a 'professional service' Triad provided to the [Millers]." Finally, Triad/Choices argues that the policy definition treats all "related acts" as a single "incident" for the purpose of coverage under the policy, and therefore the acts underlying the July 28, 2000, complaint fall under this definition because the claims are a continuation of the acts in the original lawsuit. We think that this is a strained interpretation, particularly in view of the policy as a whole. *See Knowles*, 113 N.M. at 705, 832 P.2d at 396 ("An insurance contract should be construed as a complete and harmonious instrument[.]") (internal quotation marks and citation omitted).

{16} The policy at issue is for professional liability, not general liability. "Professional Services" has been defined:

"The act or service must be such as exacts the use or application of special learning or attainments of some kind. . . . A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. In determining whether a particular act is of a professional nature or a 'professional service' we must look not to the title or character of the party performing the act, but to the act itself."

*N.M. Physicians Mut. Liab. Co. v. LaMure*, 116 N.M. 92, 96, 860 P.2d 734, 738 (1993) (quoting *Marx v. Hartford Accident & Indem. Co.*, 183 Neb. 12, 157 N.W.2d 870, 871–72 (1968) (citations omitted)). Triad/Choices is an adoption agency and all of the covered employees are insured as Counselor/Human Development Professionals. It defies credulity to interpret the claims of fraudulent transfer, successor corporate liability, and civil conspiracy as somehow being the job of a counselor or human development professional working in an adoption agency. *See N.M. Physicians Mut. Liab. Co.*, 116 N.M. at 100, 860 P.2d at 742 (determining that doctor's medical malpractice insurance does not cover his liability for civil suit alleging sexual assault, even under the guise of a medical exam in the doctor's office, because sexual assault does not constitute "rendering professional services"). However the July 28, 2000, claims may be related to the original 1996 lawsuit and subsequent judgment, it is undisputed that TRA's policy does not cover the original lawsuit or the original judgment. Straining to parse the language of the policy so that it may "arguably" cover the Millers' July 28, 2000, claims, instigated because Triad did not pay the uninsured judgment against it, fails to consider the purpose of the whole contract, which is to insure against professional liability, and fails to consider the insuring clause of Coverage A, which is limited to professional services.

{17} Triad/Choices argues that the phrase "arising out of" is very broad and general, and that the insuring clause does not limit the time frame for rendering or failing to render professional services. Only the "incident" must take place during the policy period, not the professional services. We find this argument to be without merit because we have determined that the Millers' claims do not "arise out of" the professional services of Triad/Choices. Reading the entire insuring clause, using the ordinary and usual understanding of the words, it plainly promises to pay any sums the insured is legally obligated to pay as damages because of an incident that occurs during the policy period and that arises out of the rendering of or failure to render professional services.

*"Damages"*

{18} The policy defines "damages" as:

[C]ompensatory judgments, settlements, or awards but does not include punitive or exemplary Damages, fines or penalties, the return of fees or other consideration paid to the Insured, or the portion of any award or judgment caused by the multiplication of actual Damages under federal or state law. However, if a Suit is brought against the Insured with respect to a Claim for alleged acts or omissions falling within the scope of coverage afforded by this insurance seeking both compensatory and punitive or exemplary Damages, then the Company will afford a defense to such action, without liability however, for payment of such punitive or exemplary Damages[.]

Triad/Choices argues that it is seeking a defense against the Millers' claim of loss and injury, which is precisely the kind of claimed damages that are covered under the policy. The July 28, 2000, complaint asks for an order attaching the fraudulently transferred assets or income so that the Millers may be aided in collecting their judgment and awards against Triad, an order avoiding the transfer of the assets so that the Millers may be aided in collecting their judgment and awards against Triad, and a judgment against Ms. Cheshire for an amount required to fully pay the Millers' judgment and awards along with punitive damages. TRA

argues that the Millers seek, essentially, restitution of the judgment award by which amount Choices has been enriched by virtue of Triad's avoidance of its judgment debt.

{19} We note that the damages enumerated in the July 28, 2000, complaint, totaling $63,755.18, are undeniably a result of a judgment from a claim filed in 1996 that is not covered by the policy at issue in this case. TRA had no obligation to defend against the claim on which that judgment was entered, and the current lawsuit is nothing more than a judgment creditor's action to collect the judgment through fraudulent conveyance or successor corporate liability theories. The acts of avoidance of debt alleged are much too far removed from the rendering of or failure to render professional services to in any way create a duty on TRA's part to defend.

{20} We determine that, no matter how the language of the complaint or the "damages" definition is interpreted, a reading of the entire insuring clause requires that the damages sought be caused by some kind of injury that arises out of the "rendering of or failure to render professional services." We have already determined that the acts alleged in the July 28, 2000, complaint did not arise out of the professional services of the counselor/human development professionals at Triad/Choices. We hold, as a matter of law, that TRA has no duty to defend Triad/Choices against the Millers' July 28, 2000, complaint because the complaint and the known facts do not arguably bring the claim within coverage under the policy.

**Exclusionary Clause/Insurable Act/Indemnity**

{21} TRA argues that the exclusionary clause, which excludes coverage for "any fraudulent, criminal, malicious, or materially dishonest acts or omissions of the Insured," applies to the July 28, 2000, complaint. TRA asks us to determine that Triad/Choices' act of transferring assets was an intentional attempt to avoid a judgment that violated the insurance policy and public policy, and that the act also did not encompass an insurable event. We need not reach these issues because we have determined that the July 28,

2000, complaint and the known facts do not bring the July 28, 2000, claim within the coverage stated in the insuring clause of the policy. Therefore, the exclusionary clause need not be invoked or interpreted, nor do we need to consider the broad concept of insurability in general or public policy relating thereto.

{22} We also do not address Triad/Choices' argument that the question of indemnity is premature, because we have determined that TRA has no duty to defend in this case because the complaint does not bring the claim within coverage under the policy. *See N.M. Physicians Mut. Liab. Co.*, 116 N.M. at 95, 860 P.2d at 737 (stating that when the insurer is relieved of liability it is also relieved of its duty to defend).

### Duty to Conduct an Investigation

{23} Triad/Choices finally argues that TRA did not conduct an appropriate investigation into the facts and circumstances of the case before it rejected the claim. *See G & G Servs., Inc. v. Agora Syndicate, Inc.*, 2000–NMCA–003, ¶ 23, 128 N.M. 434, 993 P.2d 751 ("[A]n insurance company is required to conduct such an investigation into the facts and circumstances underlying the complaint against its insured as is reasonable given the factual information provided by the insured or provided by the circumstances surrounding the claim in order to determine whether it has a duty to defend."). The record contains a detailed letter from Triad/Choices'

counsel to TRA outlining the facts and legal reasoning for its request for a defense, letters of response from TRA's Senior Claims Consultant and TRA's attorney, and an affidavit from TRA's attorney swearing that she had learned no new facts as of April 2001. The record also contains minutes of the Triad board of directors meeting on February 28, 2000, at which the directors discussed the Millers' complaint and the change from Triad to Choices. More importantly, Triad/Choices does not provide any additional facts for TRA or this Court to consider, or point to any facts that TRA failed to consider. Accordingly, based on the facts in the record and the lack of additional or unconsidered facts, we find no reason to determine that TRA did not perform an adequate investigation.

## CONCLUSION

{24} In light of the discussion above, we affirm.

{25} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN and RODERICK T. KENNEDY, Judges.