# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number:_____

Filing Date: December 17, 2015

**NO. 33,283**

**PULTE HOMES OF NEW MEXICO, INC., and
PULTE HOMES, INC.,**

      Third Party Plaintiffs-Appellants,

v.

**INDIANA LUMBERMENS INSURANCE
COMPANY,**

      Third Party Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Alan Malott, District Judge**

Craddock Davis & Krause, LLP
Michael J. Craddock
Dallas, TX

for Appellants

Civerolo, Gralow, Hill & Curtis, P.A.
Kerri L. Allensworth
Albuquerque, NM

for Appellee

**_____OPINION**

**GARCIA, Judge.**

{1}     Third-party plaintiffs Pulte Homes of New Mexico, Inc. and Pulte Homes, Inc. (collectively, Pulte), appeal the district court's grant of summary judgment in favor of third-party defendant Indiana Lumbermens Insurance Company (ILM) on the issue whether ILM had a duty to defend Pulte against claims brought by homeowners alleging construction defects in Pulte-built homes. We conclude that (1) claims of defective or defectively installed windows and doors in Pulte's two defense tenders to ILM constituted claims for "property damage" caused by an "occurrence" under the policy at issue; (2) the "your work" policy exclusion precluded coverage for this occurrence with regard to Pulte's May 2009 defense tender because no facts were alleged tending to show that the defective or defectively installed windows and doors caused damage to property other than the windows and doors themselves; (3) the "insured contract" exception to the policy's "contractual liability" exclusion did not override the separate and independent "your work" exclusion with regard to the May 2009 tender; however, (4) the "your work" exclusion did not preclude coverage after Pulte's March 2012 defense tender, because the tender contained claims tending to show that the defective or defectively installed windows and doors damaged the stucco surrounding those windows and doors. We therefore partially reverse the

district court's grant of summary judgment in favor of ILM and remand the case to the district court for further proceedings.

**BACKGROUND**

**A.    The Homeowners' Initial Complaint**

{2}    In the mid-2000s, Pulte built 107 homes in the Seville subdivision (Seville) on the west side of Albuquerque, New Mexico. Pulte contracted with a company named Western Building Supply (WBS) to provide the windows for those homes, but a contractor other than WBS installed those windows. Pulte also contracted with WBS to provide and install the homes' sliding glass doors. In June 2007, a large group of homeowners in the subdivision sued Pulte, alleging numerous construction defects in their homes. Although the homeowners amended their complaint four times between June 2007 and September 2009 to add plaintiffs, the complaint's allegations about the construction defects remained substantially the same in these amended complaints. Pertinent here, the complaint alleged that Pulte used "substandard and inadequate windows that leak[.]" In June 2008, most of the homeowners agreed to arbitrate their disputes with Pulte.

**B.    Pulte's First Defense Tender and Its Third-Party Complaint Against ILM**

{3}    In May 2009, Pulte tendered its first demand for a defense to ILM—the insurance company that had issued a commercial general liability policy to WBS

naming Pulte as an additional insured. Although Pulte did not include a copy of the homeowners' complaint with its defense tender, Pulte did provide a copy of an arbitration award involving six of the plaintiff homeowners and three of the homes at issue in this case. These homeowners were David and Kerri Scott (Scott), Michael and Stacey Leyba (Leyba), and Timothy and Vena Brown (Brown). The award described the following defects concerning the homes' windows and sliding glass doors:

> The Scotts' windows did not operate properly and have all been replaced by Pulte. The weight of the evidence demonstrated that when properly installed, the model of window used in Seville can be appropriate for homes of this type and price, but many of the windows were not properly installed. Some of the windows only had a small fraction of the fasteners that should have been used to install the windows. This resulted in inability to open and close the windows, substandard operation, and their early deterioration.

> . . . .

> The Leyba home suffered from windows and a sliding door that stick and will not close completely. Pulte has replaced one window that had a broken frame.

> . . . .

> The Browns' windows suffer from the same installation defects described above. Out of seventeen windows in the house, three are functional. The Browns['] children cannot operate the windows, and cannot open the sliding door to go out into the back yard. One large 5' x 8' window that was removed had only four nails holding it in, while testimony indicated it should have had approximately forty nails.

3

ILM responded to Pulte's May 2009 tender by denying coverage. By April 1, 2011, Pulte had resolved most of the homeowners' claims through arbitration or settlement, and these homeowners dismissed their claims against Pulte, including Scott, Leyba, and Brown, whose claims were the subject of the arbitration award. In May 2011, Pulte filed a third-party complaint against ILM, claiming that ILM improperly refused to indemnify and defend Pulte under the insurance policies ILM had issued to WBS.

**C.     The Homeowners' Fifth Amended Complaint**

{4}     The homeowners who remained as plaintiffs in the lawsuit amended their complaint for the fifth time in September 2011 to add plaintiffs and further allegations about the windows. The fifth amended complaint alleged that Pulte

> us[ed] substandard and inadequate windows that are approved for use in horse trailers and mobile homes and are not for use in residential construction, causing leaks, improper insulation and an inability to fasten them to the wooden frame surrounding them because they have a flange that is designed for horse trailers and mobile homes; . . . us[ed] windows that are oversized for their structural integrity, causing warping and an inability to shut and operate the windows; . . . fail[ed] to use sufficient fasteners to hold the windows in place, causing them to warp, twist and not operate; [and] us[ed] substandard and inadequate windows that leak[.]

The plaintiffs who were added in the fifth amended complaint included Catherine Macrall (Macrall), Todd and Monique Sokol (Sokol), and Jonathan and Isabella Williamson (Williamson).

## D.      Pulte's Second Defense Tender

{5}     In March 2012, Pulte tendered its second demand for a defense to ILM, which included a copy of the fifth amended complaint and lists of alleged defects concerning the homes owned by Macrall, Sokol, and Williamson. Macrall's defect list stated that "[a]ll windows and sliding glass are hard to open and close. The sliding glass door leaks; lots of dirt all the time; wind comes through whistling" and "[t]here are cracks [in the stucco] above [the] sliding glass door" and "cracks [in the stucco] by [the] front windows." ILM continued to deny that it had any duty to defend Pulte in the lawsuit.

## E.      ILM's Motion for Summary Judgment

{6}     In June 2013, ILM moved for summary judgment, asking the district court to rule that it had no duty to defend Pulte. The district court granted summary judgment in favor of ILM without a hearing, concluding only that "there [was] no genuine issue of material fact [and] Pulte . . . is not afforded coverage under the [ILM] policy with [WBS] regarding the windows and sliding doors provided to Pulte by WBS."

## F.      Pulte's Appeal

{7}     Pulte appeals, asserting that its defense tenders triggered ILM's duty to defend. Specifically, Pulte first contends that ILM had a duty to defend Pulte because at the time it tendered its defenses to ILM, "potential claims existed in the underlying action

that the windows caused damage to other property in the underlying plaintiffs' homes or caused the underlying plaintiffs' loss of use of their property." Second, Pulte contends that ILM had a duty to defend Pulte because Pulte stood in WBS's shoes for coverage due to WBS's agreement to defend and indemnify Pulte pursuant to the "insured contract[,]" as the ILM-WBS insurance policy defines that term.

**DISCUSSION**

**A.     Standard and Scope of Review**

{8}     In reviewing a grant of summary judgment, "we ordinarily review the whole record in the light most favorable to the party opposing summary judgment to determine if there is any evidence that places a genuine issue of material fact in dispute." *City of Albuquerque v. BPLW Architects & Eng'rs, Inc.*, 2009-NMCA-081, ¶ 7, 146 N.M. 717, 213 P.3d 1146. "However, if no material issues of fact are in dispute and an appeal presents only a question of law, we apply de novo review and are not required to view the appeal in the light most favorable to the party opposing summary judgment." *Id.* Pulte does not contend on appeal that there was any disputed factual issue that precluded summary judgment. Instead, Pulte asserts that "under the facts presented," the homeowners' claims against Pulte were potentially "covered under ILM's policies in accordance with New Mexico law" and that the district court "applied the wrong standard" and misinterpreted the policy language. Thus, we

6

understand Pulte's argument to be that at the time it tendered its defenses to ILM, sufficient facts had been presented that, as a matter of law, triggered ILM's duty to defend Pulte in the lawsuit. Therefore, we need not review the record to determine if any evidence viewed in the light most favorable to Pulte places a material fact at issue. *Id.* We need only conduct a de novo review of the district court's interpretation of the policy and its application of the law to the facts presented in Pulte's defense tenders. *Id.*

{9}     An insurer's obligation "is a matter of contract law and must be determined by the terms of the insurance policy." *Miller v. Triad Adoption & Counseling Servs., Inc.*, 2003-NMCA-055, ¶ 8, 133 N.M. 544, 65 P.3d 1099. We construe unambiguous policy terms "in their usual and ordinary sense" and "will not strain the words to encompass meanings they do not clearly express." *Id.* (internal quotation marks and citation omitted). Only when a policy term is ambiguous—in other words, when it is "reasonably and fairly susceptible of different constructions"—do we construe that provision "against the insurance company as the drafter of the policy." *Id.* (internal quotation marks and citation omitted). "In analyzing coverage under a commercial general liability insurance policy, courts will first examine the insuring clauses to determine whether a claim falls therein. Exclusions will only be reviewed if it [is] determined that the risk initially falls within the insuring agreements." 9A Lee R.

Russ et al., *Couch on Insurance* § 129:1, at 129-7 (3d ed. 2005) (footnote omitted).

**B.      Duty to Defend**

{10}      In New Mexico, an insurer's duty to defend is triggered when it has received "actual notice" of a claim against the insured, "unless the insured affirmatively declines a defense." *Garcia v. Underwriters at Lloyd's, London*, 2008-NMSC-018, ¶ 1, 143 N.M. 732, 182 P.3d 113. The duty to defend arises and is determined "from the allegations on the face of the complaint or from the known but unpleaded factual basis of the claim that brings it *arguably* within the scope of coverage." *Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co.*, 1990-NMSC-094, ¶ 11, 110 N.M. 741, 799 P.2d 1113 (emphasis added); *see Miller*, 2003-NMCA-055, ¶ 9 ("If the allegations of the complaint or the alleged facts *tend to show* that an occurrence comes within the coverage of the policy, the insurer has a duty to defend regardless of the ultimate liability of the insured." (Emphasis added.)).

{11}      Furthermore, an insurance company must "conduct such an investigation into the facts and circumstances underlying the complaint against its insured as is reasonable given the factual information provided by the insured or provided by the circumstances surrounding the claim in order to determine whether it has a duty to defend." *G & G Servs., Inc. v. Agora Syndicate, Inc.*, 2000-NMCA-003, ¶ 23, 128 N.M. 434, 993 P.2d 751. "Facts that are known but unpleaded may bring a claim

within the policy coverage at a later stage in the litigation." *Sw. Steel Coil, Inc. v. Redwood Fire & Cas. Ins. Co.*, 2006-NMCA-151, ¶ 14, 140 N.M. 720, 148 P.3d 806.

**C.      The Scope of the Claims on Appeal**

{12}      As an initial matter, Pulte states that it has entered into settlement agreements that limit Pulte's recovery from ILM in this case to defense and indemnity costs concerning only the claims made by Sokol, Macrall, and Williamson, which did not arise until the fifth amended complaint was filed in September 2011. Pulte asserts that we must still consider the claims contained in the May 2009 tender in order to determine whether ILM's duty to defend was triggered as early as May 2009. It makes this argument even though Sokol, Macrall, and Williamson did not appear as plaintiffs in this lawsuit until September 2011 and all of those earlier claims were ultimately resolved. ILM did not address this issue in its answer brief.

{13}      Although not fully explained in Pulte's brief in chief, it appears that the reason Pulte asks us to consider whether ILM's duty to defend was triggered as early as May 2009 is because Pulte did not notify ILM of the claims specifically involving Sokol, Macrall, and Williamson until Pulte tendered its second demand for a defense to ILM in March 2012, another six months after Sokol, Macrall, and Williamson became plaintiffs in the lawsuit. It reasoned that if ILM had been defending the lawsuit from the time it received Pulte's first defense tender in May 2009, Pulte would not have

9

needed to re-tender its defense when Sokol, Macrall, and Williamson became plaintiffs, and ILM would have had a duty to defend Pulte against the claims involving Sokol, Macrall, and Williamson as early as September 28, 2011, when the fifth amended complaint was filed. *See Guest v. Allstate Ins. Co.*, 2010-NMSC-047, ¶ 33, 149 N.M. 74, 244 P.3d 342 (recognizing that "an insurer's duty to defend . . . lasts until the conclusion of the underlying lawsuit, or until it has been shown that there is no potential for coverage"; "[w]hen multiple alternative causes of action are stated, the duty continues until every covered claim is eliminated"; "[i]n other words, the duty to defend continues through the appellate process until it can be concluded as a matter of law that there is no basis on which the insurer may be obligated to indemnify the insured" (internal quotation marks and citations omitted)). If, on the other hand, we consider only whether the March 28, 2012 defense tender triggered ILM's duty to defend Pulte, then Pulte, if successful on that issue, would not recover the defense costs involving Sokol, Macrall, and Williamson that it incurred between September 28, 2011, when the fifth amended complaint was filed, and March 28, 2012, when Pulte tendered its second demand for a defense. For these reasons, we agree that we must consider whether ILM's duty to defend was triggered at the time Pulte's first defense was tendered in May 2009.

**D.    Pertinent Policy Terms**

{14}    The following terms of the ILM-WBS insurance policy are pertinent to this appeal.

**SECTION I - COVERAGES**

. . . .

**1.    Insuring Agreement.**

    **a.**    [ILM] will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies.

    . . . .

    **b.**    This insurance applies to . . . "property damage" only if:

        **(1)**    The . . . "property damage" is caused by an "occurrence[.]"

    . . . .

**2.    Exclusions.**

This insurance does not apply to:

. . . .

    **b.    Contractual Liability**

    "[P]roperty damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

11

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract," provided the . . . "property damage" occurs subsequent to the execution of the contract or agreement.

. . . .

**l.** **Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it[.]

. . . .

**SECTION V - DEFINITIONS**

. . . .

**9.** "Insured contract" means:

. . . .

**f.** That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for . . . "property damage" to a third person[.]

. . . .

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

**16.** "Products-completed operations hazard":

12

**a.** Includes all . . . "property damage" . . . arising out of . . . "your work" except:

. . . .

    **(2)** Work that has not yet been completed or abandoned.

. . . .

**17.** "Property damage" means:

**a.** Physical injury to tangible property[;] . . . or

**b.** Loss of use of tangible property that is not physically injured.

. . . .

**22.** "Your work":

**a.** Means:

    **(1)** Work or operations performed by you . . .; and

    **(2)** Materials . . . furnished in connection with such work or operations.

{15} The term "insured" applies to both WBS as the named insured and Pulte as an additional insured, while the terms "you" and "your" apply only to WBS. Thus, Pulte is an "insured" under the policy, but the "your work" exclusion refers only to work performed by WBS.

{16} The terms of the endorsements that define the scope of Pulte's coverage as an additional insured are also relevant. When Pulte was initially designated an additional

13

insured, the endorsement stated that Pulte is

> **A.** an additional insured[], . . . but only with respect to "liability imputed" to [Pulte] "resulting from" the negligent acts or omissions of [WBS], *occurring during [WBS's] ongoing operations at the designated project.*

(Emphasis added.) However, effective May 25, 2005, another endorsement "amended" the scope of Pulte's coverage to insure Pulte "only to the extent that the liability for . . . 'property damage' is caused by '[WBS's] work' . . . and included in the 'products-completed operations hazard.' " As this definition specifically states, coverage includes property damage arising out of WBS's *completed* work.

**E.    The May 2009 Tender**

{17}    Although Pulte's May 2009 defense tender did not include a copy of the complaint, we conclude that ILM's duty to reasonably investigate the claim includes procuring a copy of the complaint. *See G & G Servs., Inc.*, 2000-NMCA-003, ¶ 23 (stating that an insurance company must "conduct such an investigation into the facts and circumstances underlying the complaint against its insured as is reasonable given the factual information provided by the insured"). Thus, we consider whether the allegations in the version of the complaint pending in May 2009, along with the facts contained in the arbitration award provided with the defense tender, triggered ILM's duty to defend Pulte. *Am. Gen. Fire & Cas. Co.*, 1990-NMSC-094, ¶ 11 ("The duty of an insurer to defend arises from the allegations on the face of the complaint *or*

14

*from the known but unpleaded factual basis of the claim* that brings it arguably within the scope of coverage." (Emphasis added.)).

{18}     Contrary to ILM's assertions, the arbitration award is relevant to ILM's duty to defend Pulte because the claims of Scott, Leyba, and Brown that were the subject of the arbitration award were part of the same complaint underlying this appeal, which was later amended by adding Sokol, Macrall, and Williamson as plaintiffs. As we previously recognized, if the claims of Scott, Leyba, or Brown triggered ILM's duty to defend Pulte, ILM would have had to defend Pulte until the end of the lawsuit or until all covered claims in the lawsuit were eliminated. *See Guest*, 2010-NMSC-047, ¶ 33 (recognizing that "[w]hen multiple alternative causes of action are stated, the duty [to defend] continues until every covered claim is eliminated" (internal quotation marks and citation omitted)).

{19}     We begin by analyzing the pertinent terms of the insuring agreement to determine whether the facts presented in the May 2009 tender "tend[ed] to show" that the claims fell within the scope of coverage. *Miller*, 2003-NMCA-055, ¶ 9; *see Am. Gen. Fire & Cas. Co.*, 1990-NMSC-094, ¶ 11; *see also* 9A Russ et al., *supra*, § 129:1, at 129-7.

**1.     The Conditions Reported in the May 2009 Tender Constituted "Property Damage"**

{20}     The first question is whether the facts presented in the May 2009 tender alleged

"[p]roperty damage[,]" as the insuring agreement defines that term. The policy defines "[p]roperty damage" as "[p]hysical injury to tangible property" or "[l]oss of use of tangible property that is not physically injured." "Tangible property can be real or personal, but it must be corporeal." 9 Steven Plitt et al., *Couch on Insurance* § 126:35, at 126-120 (3d ed. 2008). "[C]orporeal" means "[h]aving a physical, material existence[.]" *Black's Law Dictionary* 419 (10th ed. 2014). We conclude that the facts presented in the May 2009 tender constituted allegations of physical injury to tangible property under the policy for three reasons.

{21}     First, the tangible property in this case included the windows and sliding glass doors because they are corporeal—in other words, they physically and materially exist. *See id.* Second, physical injury arguably occurred to the windows and sliding glass doors because the arbitration award referred to their "deterioration" and stated that they needed to be "replaced" as opposed to merely re-installed. Third, we agree with the arbitrator that the fact that some of the homeowners had to temporarily move out of their homes while their windows were replaced constituted "[l]oss of use of tangible property that is not physically injured[,]" because their homes are tangible property, "[h]aving a physical, material existence[,]" *id.*, even if no other part of the home was physically injured by the windows and doors. However, "[t]he mere fact that there is property damage does not, in and of itself, establish a duty to defend.

16

There must also be an 'occurrence' causing that damage, and the claim must not fit within an exclusion." 14 Lee R. Russ et al., *Couch on Insurance*, § 201:9, at 201-24 (3d ed. 2005).

**2.      The "Property Damage" Was the Result of an "Occurrence"**

{22}      The next question is whether the facts presented in the May 2009 tender tended to show that the damaged windows and doors were the result of an "occurrence" as the insuring agreement defines that term. As we previously observed, the policy defines "[o]ccurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Because the policy does not define the term "accident[,]" that term "must be interpreted in its usual, ordinary and popular sense." *Vihstadt v. Travelers Ins. Co.*, 1985-NMSC-104, ¶ 6, 103 N.M. 465, 709 P.2d 187 (internal quotation marks and citation omitted). ILM argues that, because the homeowners' claims involved defective windows and doors and/or defective installation of the windows and doors, no accident occurred because faulty workmanship "does not involve the fortuity required to constitute an accident[,]" quoting 9A Russ et al., *supra*, § 129:4, at 129-13. We disagree.

{23}      Fifty years ago, our Supreme Court construed the ordinary meaning of the term "accident" in the context whether an accident insurance policy provided coverage where the insured driver died in a car wreck caused by his driving over the speed

limit. *See Scott v. New Empire Ins. Co.*, 1965-NMSC-034, ¶¶ 4-14, 75 N.M. 81, 400 P.2d 953. The insurance company argued that the car wreck was not an accident, and therefore not covered by the policy, "because the deceased was speeding over a relatively unknown, dangerous road at night and should have foreseen the consequences of his intentional acts." *Id.* ¶ 5. Our Supreme Court disagreed, concluding that the ordinary meaning of "accident" encompassed unintended consequences resulting from conduct that was "heedless, perhaps, but certainly not voluntarily self-inflicted[.]" *Id.* ¶ 14; *see King v. Travelers Ins.* Co., 1973-NMSC-013, ¶¶ 7-13, 84 N.M. 550, 505 P.2d 1226 (concluding that property damage resulting from "defective installation" of a water line was an "accident" under the insurance policy because it resulted from negligence); *Travelers Indem. Co. v. Miller Bldg. Corp.*, 97 Fed. Appx. 431, 436 (4th Cir. 2004) ("To adopt the narrow view that the term "accident" in liability policies of insurance . . . necessarily excludes negligence [including negligent workmanship] would mean that in most, if not all, cases the insurer would be free of coverage and the policy would be rendered meaningless." (internal quotation marks and citation omitted); *Iowa Mut. Ins. Co. v. Fred M. Simmons, Inc.*, 138 S.E.2d 512, 25 (N.C. 1964) (same).

{24}     Furthermore, the most recent supplement to the same insurance law treatise relied upon by ILM has observed that some jurisdictions have recently disapproved

of the view that faulty workmanship cannot constitute an accident. *See* 9A Russ et al., *supra*, § 129:3, at 32-33 (Supp. 2014). These jurisdictions have instead adopted the view that

> [a]n 'occurrence,' as the term is used in a standard commercial general liability . . . policy, does not require damage to the property or work of someone other than the insured, and thus an insured's faulty workmanship can amount to an occurrence when the only damage alleged is to work of the insured; standing alone, [the] word 'occurrence' is not used usually and commonly to convey information about the nature or extent of injuries worked by such a happening, much less the identity of the person whose interests are injured[.]

*Id.* n.7 (citing *Taylor Morrison Servs., Inc. v. HDI-Gerling Am. Ins. Co.*, 746 S.E.2d 587 (Ga. 2013));

> [t]o result in an 'occurrence' under [a] commercial general liability . . . policy providing coverage if . . . property damage was caused by an 'occurrence,' it was not necessary for [the] insured homebuilder's allegedly faulty workmanship to cause damage to real or personal property that was not part of the construction project; [the] policy defined 'occurrence' simply as 'an accident, including continuous or repeated exposure to . . . the same general harmful conditions,' and this definition did not refer to the nature or location of the property damaged.

*Id.* (citing *Owners Ins. Co. v. Jim Carr Homebuilder, LLC*, 157 So. 3d 148 (Ala. 2014)); and

> [s]ubcontractor's faulty workmanship could constitute an 'occurrence' within [the] meaning of contractor's commercial general liability . . . policy if the faulty work was 'unexpected' and not intended by the insured, and the property damage was not anticipated or intentional, so

that neither the cause nor the harm was anticipated, intended, or expected as [the] policy did not define 'occurrence' in terms of the ownership or character of the property damaged by the act or event[.]

*Id.* n.10 (citing *K & L Homes, Inc. v. Am. Fam. Mut. Ins. Co.*, 829 N.W.2d 724 (ND. 2013)); *see Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1285 (10th Cir. 2011) ("[F]ortuity is not the sole prerequisite to finding an accident under a [commercial general liability] policy.").

{25}     Given our mandate to interpret the plain language of the policy without straining the language to inject meaning that is not clearly expressed, we find these recent cases cited by the treatise the more reasoned approach to construing the meaning of "occurrence" as the policy defines that term. *See Miller*, 2003-NMCA-055, ¶ 8 (recognizing that we must construe unambiguous insurance policy terms "in their usual and ordinary sense" and must not "strain the words to encompass meanings they do not clearly express." (internal quotation marks and citation omitted)). Thus, because the definition of "occurrence" in this case does not expressly state that faulty workmanship can never constitute an accident and does not limit the term's effect to a particular class of tangible property, we conclude that the alleged property damage in this case was caused by an alleged "occurrence" as the policy defines that term.[1] We now turn to the policy's exclusions to consider whether any

---

[1]We note that if the term "accident" was ambiguous with respect to whether it was intended to encompass faulty workmanship, we would construe the policy in

20

apply to preclude coverage for the occurrences described in the May 2009 tender. *See* 9A Russ et al., *supra*, § 129:1, at 129-7.

**3.     The "Your Work" Exclusion Precluded Coverage**

{26}     ILM asserts that, even if the May 2009 tender described an occurrence, the "your work" exclusion applies because the only property damage alleged in the May 2009 tender was to WBS's work itself—the windows and sliding glass doors—and not to other property. We agree. "[W]here all of the damage that is being claimed is damage to the work of the insured[,] . . . the "your work" exclusion will apply to preclude coverage." 9A Russ et al., *supra*, § 129:17, at 129-39.

{27}     Pulte concedes this principle in its brief in chief when it states that "the 'your work' exclusion may prevent indemnity coverage for damage to the insured's work or product," but "it would not exclude damage to other property caused by the insured's work." Pulte also recognizes that "[c]ourts in several jurisdictions have found leaking windows and sliding glass doors to be an 'occurrence' *when the leaks cause other damage*." (Emphasis added). *See Travelers Indem. Co.*, 97 Fed. Appx. at 437 (noting that the "claim of *damage to guest-room carpet* caused by [the defendants'] improper installation of windows and sliding glass doors falls within the

---

favor of providing coverage to the insured. *Miller*, 2003-NMCA-055, ¶ 8 (recognizing that we must construe ambiguous provision "against the insurance company as the drafter of the policy").

21

scope of the policy" (emphasis added)); *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 137 P.3d 486, 493, 495 (Kan. 2006) (noting that faulty materials and workmanship caused the home to be continuously exposed to moisture, *which "in turn caused damage" to "surrounding structural components"* (emphasis added)); *Potomac Ins. of Ill. v. Huang*, 2002 WL 418008, \*\* 1, 15, mem. op., No. 00-4013-JPO, Mar. 1, 2002 (D. Kansas) (non-precedential) (concluding that the "your work" exclusion precluded recovery for property damage to the defective windows, but did not preclude recovery "for property damage to a third party's property—that is, the interior of the Huangs' home—arising from [the] windows[,]" where *"the water that had penetrated into the house in and around those windows had physically damaged the Huangs' home and its contents"* (emphasis added)).[2] However, Pulte does not point to any facts alleged to have existed in May 2009 that tended to show that the defective or defectively installed windows and sliding glass doors caused damage to other property, other than the fact that the windows "leak[ed]." Therefore, we conclude that the facts presented in the May 2009 tender did not trigger ILM's duty to defend because the "your work" exclusion precluded coverage under those facts.

---

[2]Pulte also cites *Travelers Indemnity Co. of America v. Moore & Associates*, 216 S.W.3d 302, 310-11 (Tenn. 2007), but that case is inapposite here because it involved work done by the named insured's subcontractor, which rendered the "your work" exclusion inapplicable because of the policy's subcontractor exception to the "your work" exclusion.

**4.      The "Insured Contract" Exception to the "Contractual Liability" Exclusion Did Not Trigger ILM's Duty to Defend in May 2009**

{28}     Pulte asserts that, even if the "your work" exclusion precluded coverage, the "insured contract" exception to the "contractual liability" exclusion was the source of ILM's duty to defend Pulte when it tendered its first defense in May 2009. As we previously noted, the policy's exclusion for contractual liability states that "[t]his insurance does not apply to[] . . . 'property damage' for which [WBS] is obligated to pay damages by reason of the assumption of liability in a contract or agreement" *except* where such "liability for damages" was "[a]ssumed in a contract or agreement that is an 'insured contract[.]' " An "[i]nsured contract" is "[t]hat part of any . . . contract . . . pertaining to [WBS's] business . . . under which [WBS] assume[s] the tort liability of another party to pay for . . . 'property damage' to a third person[.]" Pulte claims that its contract with WBS was an insured contract because it required WBS to "indemnify . . . Pulte . . . against[] all liability . . . or demands for damages to . . . property arising out of, resulting from, or relating to [WBS's] performance of the work under this [a]greement" and to "defend any and all [such c]laims which may be brought or threatened against Pulte." As a result, Pulte argues, the "contractual liability" exclusion does not apply, and ILM must assume WBS's obligation to defend Pulte, citing *Krieger v. Wilson Corp.*, 2006-NMCA-034, ¶ 45, 139 N.M. 274, 131 P.3d 661 (holding that a potential indemnitee under an insured contract may

23

bring a direct action against the insurance company that issued the commercial general liability policy).

{29} We conclude that, even if the insured contract exception renders the contractual liability exclusion inapplicable in this case, it does not render other separate and independent policy exclusions inapplicable, such as the "your work" exclusion, which we have held applies in this case to preclude coverage with regard to the May 2009 tender. *See, e.g.*, *Fed. Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 805 (10th Cir. 1998) (concluding that the contractual exclusion and its exceptions do not override another exclusion—the operations exclusion—because "the exclusions are separate and independent" and nothing in the policy indicates that one exception to one exclusion "somehow trumps" the other exclusions); *see also Federated Mut. Ins. Co. v. Ever-Ready Oil Co.*, No. 09-CV-857 JEC/RHS, 2012 WL 11945481, at * 8 (D.N.M. Mar. 9, 2012) (non-precedential) (concluding the same and citing *Fed. Ins. Co.*, 157 F.3d at 805). Pulte failed to provided any contrary authority for this Court to consider. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 ("We assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority.").

**F. The March 2012 Tender**

{30} Unlike the May 2009 defense tender, the March 2012 tender contained

24

allegations tending to show that the windows and sliding glass doors caused damage to some of the homeowners' other property in this case, namely the stucco around Macrall's windows. Macrall's defect list stated that "[a]ll windows and sliding glass are hard to open and close[, t]he sliding glass door leaks[,]" and "[t]here are cracks [in the stucco] above [the] sliding glass door" and "cracks [in the stucco] by the front windows." These allegations tend to show a claim for "property damage" caused by an "occurrence"—the home's stucco is tangible property that was arguably damaged by WBS's defective products and/or installation. And because the facts do not show, and ILM does not contend, that the stucco around the windows was also WBS's work, the "your work" exclusion does not preclude coverage.

{31} We are not persuaded by ILM's assertion that, even if the "your work" exclusion does not preclude coverage, the "products-completed operation hazard" did not apply to damages claimed to have occurred at the Macrall home because the additional insured endorsement that added that coverage was issued on May 25, 2005, *after* WBS completed its work on the Macrall home. We note that, *before* the May 25, 2005 endorsement, ILM had insured Pulte "only with respect to . . . negligent acts or omissions of [WBS], *occurring during [WBS's] ongoing operations* at the designated project." (Emphasis added.) However, *after* the May 25, 2005 endorsement, ILM insured Pulte "only to the extent that the liability for . . . 'property damage' is caused

25

by '[WBS's] work' . . . and included in the 'products-completed operations hazard.' " The "products-completed operations hazard" included all property damage "arising out of . . . '[WBS's] work' *except*[] [w]ork that has not yet been completed[.]" (Emphasis added.) In other words, *after* May 25, 2005, the policy covered Pulte only with regard to work that WBS had already completed, and it no longer covered WBS's ongoing operations. Therefore, ILM is incorrect in its assertion that the May 25, 2005 endorsement only covered work performed by WBS after May 25, 2005, because the endorsements read together plainly contemplate that WBS had completed its work for Pulte by May 25, 2005.

{32} The operative question with regard to whether the May 25, 2005 endorsement covers Macrall's claims is whether the damage to Macrall's stucco occurred within the effective dates of the policy. *See* 9A Russ et al., *supra*, § 129:23, at 129-46. (observing that products-completed operations hazard provisions "cannot be read to provide coverage for *an injury* that occurs outside the effective dates of the policy" (emphasis added) (footnote omitted)). Although Pulte may have been removed as an additional insured under the policy on June 1, 2006, ILM does not contend, and the March 2012 tender does not indicate, that the damage to Macrall's stucco occurred after June 1, 2006.

{33} Therefore, we conclude that Macrall's claims in the March 28, 2012 tender

26

were sufficient to allege a claim covered by the policy, thus triggering ILM's duty to defend Pulte as of the date of that tender. This duty to defend shall extend to all claims pending in this case as of March 28, 2012 and shall last until any of the following events occurs: the lawsuit ends, every potentially covered claim is eliminated from the lawsuit, or it can be concluded as a matter of law that there is no basis upon which ILM may be obligated to defend Pulte. *See Guest*, 2010-NMSC-047, ¶ 33 (recognizing that "an insurer's duty to defend . . . lasts until the conclusion of the underlying lawsuit, or until it has been shown that there is no potential for coverage"; "[w]hen multiple alternative causes of action are stated, the duty continues until every covered claim is eliminated"; "[i]n other words, the duty to defend continues through the appellate process until it can be concluded as a matter of law that there is no basis on which the insurer may be obligated to indemnify the insured" (internal quotation marks and citations omitted)).

**CONCLUSION**

{34}    We reverse the district court's grant of summary judgment in favor of ILM and remand this case to the district court for further proceedings consistent with this opinion.

{35}    **IT IS SO ORDERED.**

_____
**TIMOTHY L. GARCIA, Judge**

27

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Chief Judge**

_____
**CYNTHIA A. FRY, Judge**