**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2009-NMCA-081

Filing Date:  June 9, 2009

Docket No. 27,837

CITY OF ALBUQUERQUE,

       Defendant/Cross-Claimant/Appellee,

v.

BPLW ARCHITECTS & ENGINEERS, INC.,

       Defendant/Cross-Defendant/Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**William F. Lang, District Judge**

The Baker Law Firm
Jeffrey L. Baker
Renni Zifferblatt
Albuquerque, NM

for Appellee

Montgomery & Andrews, P.A.
Kevin M. Sexton
Albuquerque, NM

for Appellant

## OPINION

**FRY, Chief Judge.**

**{1}**    This case arises from a dispute over an indemnification clause in a contract between the City of Albuquerque and BPLW Architects & Engineers, Inc. (BPLW) for the design and construction of the rental car facility at the Albuquerque International Airport.  After a pedestrian was injured at the facility, the City requested a defense from BPLW pursuant to the indemnification clause.  BPLW denied the request, and the City filed a claim against BPLW.  The district court granted partial summary judgment in the City's favor, finding that

1

BPLW was required to defend the City in the lawsuit brought by the pedestrian because the claim arose from BPLW's design and construction of the facility. BPLW appeals. We affirm.

**BACKGROUND**

{2}     In 1998, the City entered into an architectural services contract with BPLW for the design of the rental car facility at the airport. While BPLW was initially responsible only for the design of the facility, the contract provided that the City could require BPLW to perform construction services if needed. Pursuant to this provision, BPLW took full responsibility for the construction administration services for the project and proceeded to oversee the construction of the facility it had designed. The project was completed, and the City took possession in 2001. Two weeks after the facility opened, a pedestrian, John Pound, fell off a curb while exiting one of the car rental buildings located at the facility. Pound suffered extensive injuries and filed suit against the City, alleging that the curb from which he fell was excessively high and that the City had "failed to properly construct the curb and adjacent pavement," had "failed to correct a hazardous condition, specifically the excessively high curb," and had "failed to inspect and/or maintain the curb and adjacent pavement where" he had fallen. Pound later filed an amended complaint, reasserting his allegations against the City and adding a number of additional defendants, including BPLW. In the amended complaint, Pound alleged that BPLW had negligently designed the curb and had failed to use reasonable care in the inspection and supervision of the construction of the curb.

{3}     As revealed by discovery later, the curb that Pound fell from was adjacent to a handicap ramp and varied in height from about eleven inches, where the curb met the top of the ramp, to less than one inch where the base of the ramp began. According to BPLW, this curb was a "header curb" built in compliance with a standard design specification for header curbs provided by the City. The portion of curb where Pound fell was apparently located near the door to one of the rental car buildings, about a foot high, and it was neither marked to indicate that there was a sharp change in elevation nor blocked by any type of barrier to prevent a person from stepping off the curb. Pound alleged that it was the placing of this high curb in a pedestrian pathway that caused him to fall.

{4}     After receiving Pound's complaint, the City requested that BPLW honor its contractual obligation to defend and indemnify the City. BPLW refused. The City then filed a cross-claim against BPLW, alleging that BPLW had a contractual duty to defend and indemnify the City for any cause of action arising out of BPLW's performance of the contract. The City and BPLW later independently settled the claims brought against them by Pound, leaving only the cross-claim between the City and BPLW to be litigated.

{5}     The City then filed a partial motion for summary judgment limited solely to the issue of whether BPLW had a duty to defend. The district court granted the City's motion, finding that BPLW had a duty to defend, and awarded the City approximately $90,000 in attorney

2

fees for the expenses the City incurred defending the claims Pound brought against it. The district court also certified its order as final under Rule 1-054(B) NMRA, finding that there was no just reason for delay. BPLW timely appealed.

**{6}** On appeal, BPLW argues that it did not have a contractual duty to defend the City because none of Pound's allegations alleged that the City was vicariously liable for BPLW's negligence and because all of the allegations against the City were for the City's direct negligence, not BPLW's. BPLW also argues that it does not have a duty to defend because the indemnity clause contained an exception that relieves BPLW of its duty to defend the City if the cause of action arises out of the City's negligence in approving designs or providing design specifications. Because the City approved all of the designs for the rental car facility and because the curb in question complied with a City design specification, BPLW argues that the cause of action falls within this exception to its duty to defend.

## DISCUSSION

### Standard of Review

**{7}** On appeal from the grant of summary judgment, we ordinarily review the whole record in the light most favorable to the party opposing summary judgment to determine if there is any evidence that places a genuine issue of material fact in dispute. *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 15, 123 N.M. 752, 945 P.2d 970; *see Gormley v. Coca Cola Enters.*, 2005-NMSC-003, ¶ 8, 137 N.M. 192, 109 P.3d 280. However, if no material issues of fact are in dispute and an appeal presents only a question of law, we apply de novo review and are not required to view the appeal in the light most favorable to the party opposing summary judgment. *Rutherford v. Chaves County*, 2003-NMSC-010, ¶ 8, 133 N.M. 756, 69 P.3d 1199. Neither party argues that there are any material facts in dispute, nor do we find any disputed facts in our review of the record. Instead, both parties argue that resolution of this appeal depends solely on the legal question of when a contractual duty to defend is triggered and on the interpretation of the indemnity clause between BPLW and the City. Thus, we review the district court's grant of summary judgment de novo.

### The Duty to Defend Arises From the Terms of the Contract and the Allegations of the Complaint

**{8}** The City argues that in order to determine whether a duty to defend exists, we should look at the terms of the contract and the allegations contained in the complaint. According to the City, if the allegations in the complaint fall within the terms of the contract, then the duty to defend is triggered. BPLW, on the other hand, argues that a contractual duty to defend can only be triggered if vicarious liability is alleged in the underlying complaint. While BPLW acknowledges that our case law suggests that the City's view is correct, it argues that the cases that set out this rule all involve insurance contracts and thus that the rule is inapplicable to a duty to defend contained in other types of contracts. *See, e.g.*,

*Bernalillo County Deputy Sheriffs Ass'n v. County of Bernalillo*, 114 N.M. 695, 697, 845 P.2d 789, 791 (1992) (holding that an insurer's duty to defend arises from the allegations in the complaint against the insured). We disagree with BPLW and, as we explain below, we hold that a contractual duty to defend is triggered by the allegations in the complaint.

**{9}** In disputes stemming from insurance contracts, the "duty to defend arises out of the nature of the allegations in the complaint," *Miller v. Triad Adoption & Counseling Servs., Inc.*, 2003-NMCA-055, ¶ 9, 133 N.M. 544, 65 P.3d 1099, and is determined "by comparing the factual allegations in the complaint with the insurance policy." *Lopez v. N.M. Pub. Sch. Ins. Auth.*, 117 N.M. 207, 209, 870 P.2d 745, 747 (1994). If a complaint "states facts that bring the case within the coverage of the policy," then the duty to defend will be triggered. *Bernalillo County Deputy Sheriffs Ass'n*, 114 N.M. at 697, 845 P.2d at 791. However, "[i]f the allegations of the complaint clearly fall outside the provisions of the policy, neither defense nor indemnity is required." *Id.*

**{10}** BPLW argues that these rules are inapplicable and "irrelevant to a non-insurance scenario." As its sole support for this argument, BPLW cites a number of Florida cases that it interprets as holding that a contractual duty to defend is triggered only when vicarious liability is alleged in a complaint. *E.g.*, *Metro. Dade County v. CBM Indus. of Minn., Inc.*, 776 So. 2d 937, 939 (Fla. Dist. Ct. App. 2001) (finding duty to defend where complaint stated a cause of action for vicarious liability); *SEFC Bldg. Corp. v. McCloskey Window Cleaning, Inc.*, 645 So. 2d 1116, 1117 (Fla. Dist. Ct. App. 1994) (refusing to find duty to defend where complaint alleged only active negligence of indemnitee); *Metro. Dade County v. Fla. Aviation Fueling Co.*, 578 So. 2d 296, 298 (Fla. Dist. Ct. App. 1991) (finding duty to defend where complaint alleged vicarious liability). Contrary to BPLW's argument, these cases did not hold that a duty to defend can only be triggered if the allegations of a complaint allege vicarious liability. Instead, these cases were decided on the ground that the indemnity agreements in question expressly precluded indemnity for the indemnitee's own negligence. In *CBM Industries*, for example, the indemnity agreement expressly stated that "nothing herein shall . . . require [CBM] to indemnify the [c]ounty against liability resulting from the willful, negligent, or unlawful acts . . . of the [c]ounty." 776 So. 2d at 938 (first alteration in original) (emphasis omitted) (internal quotation marks omitted). Because the contract expressly excluded indemnification of claims that the county was negligent, the only way the county could establish a contractual duty to defend was through the vicarious liability claims asserted against it. *Id.*; *see SEFC Bldg. Corp.*, 645 So. 2d at 1117 (refusing to find duty to defend from the indemnitee's own negligence where an indemnity agreement did not expressly state "such intent in clear, unequivocal terms").

**{11}** BPLW does not make any further argument in support of its contention other than the bare assertion that the rules comparing the complaint's allegations with the contract should not apply to anything other than insurance contracts. While we recognize that the primary purpose of an insurance contract is to defend and indemnify an insured and that the primary purpose of the contract at issue in this case is for construction services, not indemnity, we are not persuaded that we should create a new rule for determining when a

4

non-insurance contractual duty to defend arises. In both types of contracts, the duty to defend is a contractual obligation that the parties have bargained for as a part of their agreement. Because the duty to defend is a contractual obligation, we hold that regardless of the type of contract containing it, the duty to defend arises when the language of a complaint states a claim that falls within the terms of the contract.

**BPLW Has a Contractual Duty to Defend the City, Even for the City's Own Alleged Negligence, as Long as the City's Negligence Arises From BPLW's Negligence**

**{12}** We now consider whether Pound's allegations against the City fall within the scope of BPLW's duty to defend. BPLW argues that all of Pound's allegations against the City were that the City, not BPLW, was negligent and that the indemnity clause does not require BPLW to defend the City for the City's own negligence. BPLW further argues that requiring it to indemnify the City when the City is alleged to be negligent would violate the public policy expressed in NMSA 1978, Section 56-7-1 (1971) (amended 2003 and 2005), which makes void any indemnity agreement in a construction contract that requires an indemnitor to indemnify an indemnitee for the indemnitee's own negligence. The City, on the other hand, argues that the indemnity clause requires BPLW to defend the City for any cause of action that arises from the negligent act, error, or omission of BPLW even if the complaint alleges that the City itself was negligent.

**{13}** Neither party disputes that Pound's allegations against the City were that the City itself, not BPLW, was negligent. Thus, resolution of this appeal requires us to interpret the contract between the parties and determine whether the indemnity clause required BPLW to defend the City even if the City is alleged to have been negligent. The parties do not contend that the contract was ambiguous, and, therefore, "the interpretation of language in [the] contract is an issue of law which we review de novo." *Krieger v. Wilson Corp.*, 2006-NMCA-034, ¶ 12, 139 N.M. 274, 131 P.3d 661 (filed 2005).

**{14}** In order to determine the applicability of an indemnity provision in a contract, "[w]e apply the general rules of contract construction in determining the meaning of the language used" by the parties. *Id.* ¶ 13. This requires us to construe the contract "as a harmonious whole" and to give every word and phrase "meaning and significance according to its importance in the context of the whole contract." *Id.* (internal quotation marks and citation omitted). The indemnity clause between the City and BPLW provides that BPLW

> agrees to defend, indemnify, and hold harmless the City . . . against all suits . . . brought against the City because of any injury or damage received or sustained by any person . . . arising out of or resulting from any negligent act, error, or omission of [BPLW] . . . arising out of the performance of this Agreement.

**{15}** Aside from the specific exceptions that we discuss below, there is no language in the contract that limits BPLW's duty to defend the City to complaints that do not allege that the

5

City was negligent. Instead, the plain language of this clause indicates that the duty to defend applies to *all suits* against the City arising out of a negligent act, error, or omission of BPLW arising out of the performance of the agreement. Consequently, BPLW has a duty to defend the City, even if only the City is alleged to be negligent, as long as the cause of action arises from the alleged negligent act, error, or omission of BPLW.

**{16}** Although this provision does not explicitly state that BPLW must indemnify the City for the City's own negligence, our Supreme Court has held that a provision such as this is to be broadly construed to provide indemnity for the indemnitee's own negligence if "the intention to save [the indemnitee] harmless . . . is clear and unequivocal" in the contract. *Metro. Paving Co. v. Gordon Herkenhoff & Assocs.*, 66 N.M. 41, 43, 341 P.2d 460, 461 (1959). Here, the contract provides that BPLW will defend the City from *all suits* against the City that arise out of BPLW's negligence in the performance of the contract. The only limitation on this duty is that

> [n]othing in the Agreement shall be construed to require [BPLW] to (defend) indemnify and hold harmless the City . . . from and against liability . . . caused by or resulting from in whole or in part the negligence, act or omission of the City . . . [1] arising out of the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs or specifications by the City . . . or [2] the giving or failure to give directions or instructions by the City . . . where such giving or failure to give directions or instructions is the primary cause of bodily injury to persons or damage to property.

Aside from these very specific and limited exceptions that relieve BPLW of its duty to defend if the cause of action arises from the City's negligent approval or preparation of designs and specifications, the contract does not contain any other limiting language excluding claims that the City was negligent. BPLW's obligation to defend the City from *all suits* therefore includes causes of action alleging that the City itself was negligent, as long as the cause of action arises from BPLW's performance of the agreement. The gist of Pound's complaint against all defendants was that the design of the curb and surrounding area was dangerous; Pound also alleged that BPLW designed the site.

**{17}** Indeed, the language used to delineate the specific exceptions to BPLW's duty to defend, which is quoted in the preceding paragraph, supports our interpretation of the indemnity clause. This language—used to relieve BPLW of its duty to defend if the cause of action arises from the City's negligent approval or preparation of designs and specifications—is derived almost verbatim from the 1971 version of Section 56-7-1, the anti-indemnity statute in effect at the time the contract was drafted. Section 56-7-1 mandated that any indemnity agreement in a construction contract that requires an indemnitor to indemnify an indemnitee for the indemnitee's own negligence is "against public policy. . . void and unenforceable" unless the agreement specifically provides that the indemnity does "not extend to liability . . . arising out of . . . the preparation or approval of maps, drawings,

6

opinions, reports, surveys, change orders, designs or specifications by the indemnitee, or the agents or employees of the indemnitee."

**{18}** Notably, the statute required the exclusionary language used by BPLW and the City *only* if an indemnity agreement required an indemnitor to indemnify the indemnitee for the indemnitee's own negligence. *See id.* By using language that is required only under such circumstances, it is clear that the parties specifically intended BPLW to indemnify and defend the City when the City is alleged to be negligent as long as the cause of action arises from BPLW's design or construction of the facility. If, as BPLW argues, the indemnity clause did not require BPLW to indemnify the City for the City's alleged negligence, then the exclusionary language would not have been necessary. *See Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.*, 2001-NMCA-082, ¶¶ 19, 31, 131 N.M. 100, 33 P.3d 651 (noting that "[w]e will not read a particular provision of a contract such that another provision is rendered meaningless"). Thus, the clear intent of the contract is for BPLW to defend the City from any lawsuit alleging that the City itself was negligent, as long as the cause of action arises from BPLW's alleged negligence, unless the claim arises from the City's negligent approval or preparation of a design or specification.

**{19}** We also reject BPLW's argument that requiring it to defend the City for the City's alleged negligence violates the public policy expressed in Section 56-7-1. A 2003 amendment to Section 56-7-1 eliminated the exclusionary language, which was used in the contract's indemnity clause, required by the 1971 version of the statute. *See* § 56-7-1 (1971); 2003 N.M. Laws, ch. 309, § 1; 2003 N.M. Laws, ch. 421, § 1. The statute now provides that

> [a] construction contract may contain a provision that, or shall be enforced only to the extent that, it:
>
> (1)       requires one party to the contract to indemnify, hold harmless or insure the other party to the contract . . . against liability . . . only to the extent that the liability . . . [is] caused by, or arise[s] out of, the acts or omissions of the indemnitor or its officers, employees or agents[.]

Section 56-7-1(B)(1). Both the current version and the version in effect at the time the contract was executed, however, have the same effect because both ensure that an indemnitor only has to indemnify for causes of action that arise from the indemnitor's own negligent conduct. In addition, both versions of the statute are based on a public policy promoting safety in construction projects by holding each party to the contract accountable for injuries caused by its own negligence. *See Tucker v. R.A. Hanson Co.*, 956 F.2d 215, 218 (10th Cir. 1992) (noting that "[t]he purpose of [Section 56-7-1] is to protect construction workers and future occupants of a building by ensuring that all those involved in its construction know that they will be held financially liable for their negligence"); *Guitard v. Gulf Oil Co.*, 100 N.M. 358, 362, 670 P.2d 969, 973 (Ct. App. 1983) (noting that the mining anti-indemnity statute, NMSA 1978, § 56-7-2 (1971) (amended 1999 and 2003), was intended to promote

7

public safety by ensuring that each party to a mining contract is held accountable for its own negligence and will therefore have an incentive to operate in a safe manner).

{20}     Here, requiring BPLW to fulfill its contractual obligation to defend the City against any suit against the City arising out of BPLW's alleged negligence in the performance of the contract does not violate Section 56-7-1 or the policy behind it.  Instead, this interpretation of the contract is fully consistent with the requirements of the statute.  It promotes safety in the construction project because it ensures that BPLW will be accountable for any harm caused by its performance of the agreement.

**Pound's Claims "Arise From" BPLW's Design and Construction of the Facility**

{21}     We now consider whether Pound's allegations fall within the scope of the indemnity clause and arise from BPLW's performance of the agreement.  The complaint stated a claim of negligence, alleging that the City owed and breached a duty of reasonable care in the construction and maintenance of the curb by "fail[ing] to properly construct the curb and adjacent pavement," and stated a claim of premises liability, alleging that the City failed to properly inspect and construct the area where Pound fell.  These claims state two distinct allegations: (1) the City negligently constructed the curb and (2) the City negligently failed to maintain and make safe the area where Pound fell.  BPLW argues that it does not have a duty to defend because Pound's allegations are directed at the City's direct negligence, not BPLW's.  While we agree with BPLW that Pound alleged that the City was negligent, we disagree with BPLW's assertion that the suit did not arise from BPLW's alleged negligence.

{22}     The indemnity clause requires BPLW to defend the City from any action "arising out of or resulting from any negligent act, error, or omission of [BPLW] . . . arising out of the performance of" the contract.  The phrase "arising out of" is given a broad interpretation by our courts and is generally "understood to mean 'originating from,' 'having its origin in,' 'growing out of[,]' or 'flowing from.'" *Krieger*, 2006-NMCA-034, ¶ 14.  Using this definition of the phrase "arising out of," BPLW has a contractual duty to defend the City for all claims that originate from, have their origin in, grow out of, or flow from the negligent performance of its contract with the City.  The undisputed facts indicate that BPLW was responsible for the design and supervision of the construction of the curb.  Thus, all of the allegations regarding the design and construction of the curb clearly arise from BPLW's allegedly negligent performance of the contract and therefore fall within the duty to defend.

{23}     BPLW further argues that because some of the claims also allege that the City breached its duty to maintain and make safe the premises, BPLW is relieved of its obligation to defend.  In support of this argument, BPLW cites *Williams v. Central Consolidated School District*, 1998-NMCA-006, ¶ 16, 124 N.M. 488, 952 P.2d 978 (filed 1997), a case in which this Court held that "[e]ven if a building is designed by an independent private architect, the state is responsible for its own duty of care in and around the work of the architect as part of its 'operation or maintenance' of the building."  In that case, a student had fallen through a negligently designed window that, due to its location and the type of glass, created a

dangerous condition for students. *Id.* ¶¶ 3-4. BPLW misconstrues the case as relieving it from its duty to defend the City. *Williams* dealt solely with whether the state could be sued for negligent maintenance of a building when the unsafe condition was caused by an architect's design defects. *Id.* ¶ 16. *Williams* did not, however, address whether the architect would have been required to indemnify the state had there been an indemnity agreement like the one in the present case.

**{24}** Here, Pound alleged that the City negligently failed to inspect and maintain the curb that Pound fell from. Contrary to BPLW's argument, these claims, like the claims that the curb was negligently constructed, "arise from" BPLW's allegedly negligent performance of the contract. Pound alleged that the City failed to fix a curb that was dangerously high. However, had BPLW designed and constructed the curb in such a way as to avoid the dangerous condition, then there would not have been any dangerous condition for the City to make safe. Thus, the claims that the City failed to inspect and maintain the curb area "arise from" BPLW's performance of the contract because the claims have their origin in, grow out of, and flow from the allegedly negligent design and construction of the curb by BPLW.

**The Exclusionary Language of the Indemnity Clause Does Not Relieve BPLW of Its Duty to Defend**

**{25}** BPLW next argues that the exclusionary provisions of the indemnity clause relieve it of its duty to defend because the curb was built and designed in accordance with standard design specifications for header curbs provided by the City and because the City approved the plans prior to the construction of the facility. The exclusionary language of the indemnity clause relieves BPLW of its duty to defend the City from liability "arising out of the preparation or approval of maps, drawings, . . . designs or specifications by the City."

**{26}** According to BPLW, the curb that Pound fell from was constructed and designed in full compliance with the City's DWG.2415, a design-specification sheet that details how to construct various types of curbs used in city construction projects. DWG.2415 contains drawings specifying the City's requirements for the construction of seventeen different types of curbs and gutters and includes information on the dimensions of the various curbs as well as the type of construction materials that must be used to build the curbs. The specifications for the header curb, the type of curb at issue, indicate that a header curb can be up to eighteen inches high and that there is no requirement that any type of safety rail be placed above the curb.

**{27}** BPLW argues that because it relied on the City's design specifications for the header curb, it does not have a duty to defend the City under the exclusionary language of the contract. According to BPLW, it was the City's design specifications that caused the curb to be unreasonably high, not any design defect in BPLW's construction and design of the curb. We disagree.

9

**{28}** In order for BPLW to be relieved of its duty to defend under the exclusionary language of its contract with the City, the cause of action must *arise from* the City's preparation or approval of maps, drawings, designs, or specifications. The cause of action in this case, however, does not arise from the design specifications for a header curb. While BPLW may have been required to build all header curbs to comply with the City specifications, there is no indication that BPLW was required to use a header curb in the specific location where the curb was actually constructed. In the process of designing the rental car facility, BPLW opted to install a header curb in the particular location where Pound fell. According to the allegations in Pound's complaint, it was the placing of an excessively high curb in a pedestrian path that is alleged to have caused the fall, not some defect in the design specifications for the header curb.

**{29}** To the extent that Pound's allegations even mention DWG.2415, Pound only alleges that the City violated the design specifications when it constructed the curb, not that there was some defect in the design specifications themselves. Because BPLW, not the City, was responsible for the placement of the curb in a particularly dangerous location, the alleged failure to comply with the specifications falls within BPLW's duty to defend the City, not the exclusionary language of the contract. Thus, for purposes of determining whether BPLW had a duty to defend, Pound's complaint states a claim that arises from BPLW's design and construction of the curb in question, not from some defect in the City's design specifications for header curbs such that BPLW would be relieved of its duty to defend.

**{30}** BPLW next argues that it is relieved of its obligation to defend the City because the City approved all of the plans BPLW had designed prior to the construction of the facility. There are no allegations in the complaint that Pound's injuries arose from the City's approval of BPLW's design for the rental facility. Instead, all of the allegations against the City relate to the design and construction of the facility. Because BPLW designed and constructed the facility, these allegations all arise from BPLW's performance of the contract and are subject to BPLW's general obligation to defend the City.

**Indemnification**

**{31}** BPLW finally argues that the district court erred in denying its motion for summary judgment in which BPLW sought a determination that it did not have a duty to indemnify and reimburse the City for the settlement the City paid to Pound. The district court's grant of partial summary judgment, however, dealt solely with whether BPLW had a duty to defend, not whether BPLW had a duty to indemnify. In addition, "the duty to indemnify is distinct from [the] duty to defend," and resolution of whether a party has a duty to defend does not necessarily depend on there being a duty to indemnify. *Ins. Co. of N. Am. v. Wylie Corp.*, 105 N.M. 406, 409, 733 P.2d 854, 857 (1987). While we look to the allegations in the complaint and the terms of the contract to determine whether a duty to defend has been triggered, whether BPLW will also be required to indemnify the City requires the resolution of material facts by the district court. Thus, the issue of BPLW's duty to indemnify the City is not properly before us, and we therefore do not address it.

10

**CONCLUSION**

**{32}** For the foregoing reasons, we affirm the district court's grant of partial summary judgment in favor of the City of Albuquerque.

**{33}    IT IS SO ORDERED.**

_____
**CYNTHIA A. FRY, Chief Judge**

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**

_____
**RODERICK T. KENNEDY, Judge**

**Topic Index for** *City of Albuquerque v. BPLW Architects & Engineers, Inc.*, **No. 27,837**

| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |

| **CP** | **CIVIL PROCEDURE** |
| CP-SJ | Summary Judgment |

| **CN** | **CONTRACTS** |
| CN-DD | Duty to Defend |
| CN-ID | Indemnification Agreement |

| **NG** | **NEGLIGENCE** |
| NG-ID | Indemnification |
| NG-PI | Personal Injury |
| NG-VL | Vicarious Liability |

| **RE** | **REMEDIES** |
| RE-ID | Indemnification |