The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: February 23, 2023

**No. A-1-CA-39598**

**GILDARDO CAMARENA, by and through his Guardians, Rosa Cruz Camarena and Bianca Camarena,**

Plaintiff-Appellant,

v.

**SUPERIOR CONTRACTING CORPORATION d/b/a AMERICAN NATIONAL INSULATION & SEALANTS (ANI); and JOHN DOE, SWG Foreman/Manager,**

Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Benjamin Chavez, District Court Judge**

Gorence & Oliveros PC
Robert J. Gorence
Albuquerque, NM

Durham, Pittard & Spalding, LLP
Caren I. Friedman
Justin R. Kaufman
Rosalind B. Bienvenu
Santa Fe, NM

Bowles Law Firm
Jason Bowles
Albuquerque, NM

for Appellant

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Earl E. DeBrine, Jr.
Jeremy K. Harrison
Elizabeth A. Martinez
Bayard Roberts
Albuquerque, NM

for Appellees Superior Contracting Corporation d/b/a American National
Insulation and Sealants

**OPINION**

**BUSTAMANTE, Judge, retired, sitting by designation.**

{1} This case presents another opportunity for this Court to address the contours of a *Delgado* claim—the assertion that an employer willfully injured its employee, thus subjecting it to general tort liability rather than the exclusivity provision of the Workers' Compensation Act (WCA). *Delgado v. Phelps Dodge Chino, Inc*., 2001-NMSC-034, ¶ 1, 131 N.M. 272, 34 P.3d 1148. The claim before us involves a scaffolding that was ninety-five feet high and overloaded two to four times its capacity with sixteen tons of masonry block. The scaffolding collapsed and as a result, Gildardo Camarena, the plaintiff in this case, suffered permanent, serious bodily injury. The district court granted summary judgment in favor of Camarena's employer, after determining that Camarena failed to establish a genuine issue of material fact regarding the objective and subjective prongs of the *Delgado* test. We affirm.

**BACKGROUND**

**Factual Background**

{2} McCarthy Building Companies NM, Inc. (McCarthy) served as the general contractor for the construction of an addition to Rust Presbyterian Medical Center (the project). Defendant Superior Contracting Corporation, which was doing business as American National Insulation and Sealants (ANI) was a subcontractor

hired to provide insulation, waterproofing, and fireproofing for the project. Camarena worked for ANI on the project for two and a half months before the day of the incident that gave rise to this case. Les File Drywall, Inc. and its affiliate Les File LP (collectively, Les File) were hired to construct the walls of the building and provide scaffolding for McCarthy, ANI, and other subcontractors, including Little Enterprises, Inc. d/b/a Stone Cold Masonry (Stone Cold) that installed a block façade on the building and Southwest Glass & Glazing, Inc. (SGG) that installed windows.

{3}     Les File owned, designed, and constructed the scaffolding for the project. Les File and McCarthy established a scaffold safety protocol, which required Les File to inspect the scaffold to ensure it met OSHA regulations and was safe for use. The protocol required Les File to affix a green tag to the scaffold ladder designating it as safe for use or to affix a red tag if it was not safe to use. The tag was required to include the date and time the scaffolding was inspected. The record reveals there was a green tag on the scaffolding the day of the incident.

{4}     On the day in question, scaffolding was set up against a six-story building. The scaffolding was sixteen levels high, and the top level was approximately ninety-five feet above the ground. Stone Cold employees had loaded 31,783 pounds—almost sixteen tons and two to four times the scaffolding's capacity—of block onto the scaffolding several levels below where ANI employees were working. Camarena and four other ANI employees were on the fourteenth level of the scaffolding, while

two other ANI employees were on the ground level. The scaffolding collapsed, and Camarena sustained a permanent traumatic brain injury that left him incapacitated.

{5}    The parties provided conflicting evidence regarding when the block was loaded onto the scaffolding. Camarena provided evidence from Stone Cold employees that testified the block was loaded onto the scaffolding two to three days before the incident in question. He also provided evidence that loading blocks onto the scaffolding was discussed each morning at safety meetings, which ANI's foremen were required to attend. ANI presented testimony from its supervisors, Paul Gomez and Jose Garcia, that they inspected the scaffolding a few hours before the incident and saw no significant amount of block on the scaffolding. It is undisputed that there was no block on the level Camarena was working on.

**Procedural Background**

{6}    Camarena, through his guardians, filed an amended complaint in this case against SGG; John Doe, an SGG "Foreman/Manager"; ANI; Gomez, an ANI foreman; and Garcia, another ANI foreman, making claims for negligence against all the defendants and a *Delgado* claim against ANI, Gomez, and Garcia. Camarena voluntarily dismissed SGG, Gomez, and Garcia, leaving only its *Delgado* claim against ANI and negligence claims against John Doe.

{7}    Both Camarena and ANI filed motions for summary judgment. ANI's motion advanced two main arguments. The first was that, as a matter of law, ANI's liability

3

was based on the actions of Gomez and Garcia, and by voluntarily dismissing with prejudice his claims against Gomez and Garcia, Camarena's claim against ANI was extinguished. The second was that the actions of Gomez and Garcia were not sufficient to meet the *Delgado* standard for willful and egregious conduct.

{8}    Broadly, ANI argued that in order to sustain a *Delgado* claim, a plaintiff must present evidence that demonstrates a degree of egregiousness comparable to the facts in *Delgado*. That is, the employers' actions must include a combination of deadly conditions, profit-motivated disregard for easily implemented safety measures, complete lack of worker training or preparation, and outright denial of assistance to a worker in a terrifying situation. With regard to the subjective prong of the *Delgado* test, ANI argued that Camarena presented no evidence that ANI employees knew the scaffolding had been overloaded beyond its capacity and that the scaffolding was in danger of collapsing. ANI pointed to evidence that ANI employees had seen a green tag and that Camarena's expert testified that he was unable to determine the capacity of the scaffolding. With regard to the objective prong of the *Delgado* standard, ANI noted that Camarena was sent to do a routine task he had been doing for years, on a project he had been working on for two and a half months, he expressed no safety concerns, and, therefore, sending Camarena onto the scaffold was not sending him into a hazardous situation that was virtually certain to result in serious injury or death.

{9}     Responding to ANI's factual presentation, Camarena objected to testimony from ANI employees saying they saw a green tag the day of the incident, arguing that it was inadmissible because it came from depositions taken in a different case. He also provided evidence that the block was loaded over a two- to three-day period before the collapse, despite ANI foremen Gomez and Garcia testifying they did not see the block the morning of the incident. Regarding ANI's *Delgado* argument, Camarena incorporated the arguments set forth in his motion for summary judgment to argue there was an issue of fact regarding whether the *Delgado* standard was met. Garcia, the ANI supervisor, testified that he would not have let workers onto the scaffold if there were more than five blocks on it, yet the ANI supervisors ordered their workers onto the scaffold even though it was loaded with almost 32,000 pounds of block. Camarena also argued that ANI's assertion that its foremen did not see the block was contradicted by multiple witnesses.

{10}     The district court denied Camarena's motion and granted ANI's motion. Addressing Camarena's motion first, the district court noted that his argument that the facts conclusively showed that ANI was aware of the danger posed by the overloaded scaffold was predicated on "inferring that ANI supervisors testified untruthfully at their depositions." The district court refused to make this inference, citing the rule that inferences can only be made in favor of the nonmoving party. Thus, it ruled Camarena did not meet his burden.

{11} Addressing ANI's motion, the district court determined that, even if Camarena could establish that Gomez and Garcia saw the block on the scaffold, ANI's conduct did not exemplify a degree of egregiousness or conduct that approximated the employer's conduct in *Delgado*. The district court determined the objective prong was not met because ANI employees had been working on the project for several months and on the specific scaffolding for over two weeks. It pointed to evidence that employees testified the scaffolding was green tagged and did not think the scaffolding was unsafe. The district court also noted that Camarena was an experienced worker. For the subjective prong, it noted ANI employees saw a green tag on the scaffolding the day in question, and despite seeing the block on the scaffold, they did not think it was unsafe. It noted that Camarena presented no evidence that he lacked training or preparation to work on the scaffolding or that ANI denied him assistance in a terrifying situation. The district court determined that, to avoid summary judgment, Camarena had to demonstrate a combination of deadly conditions, profit-motivated disregard for easily implemented safety measures, complete lack of worker training or preparation, and outright denial of assistance to a worker in a terrifying situation. Finally, the district court determined that Camarena's *Delgado* claim was extinguished when Gomez and Garcia were dismissed with prejudice.

**DISCUSSION**

{12} We address finality, the *Delgado* issue, and Camarena's motion for sanctions.[1]

## I. Finality

{13} When Camarena filed his amended complaint, he named numerous parties including an unnamed "John Doe, [SGG] Foreman/Manager." The unnamed John Doe was never served or identified and never appeared in the case. As the case proceeded, Camarena dismissed his claims against most of the parties, leaving only ANI and John Doe as named parties. Once the district court granted summary judgment in favor of ANI, John Doe was the only remaining named party in the suit. After Camarena appealed to this Court, we directed "the parties to brief the issue of whether a 'John Doe' party, even if not served, must be explicitly dismissed via district court order so as to render a dismissal order final and therefore appropriate for appellate review." Camarena argues, and ANI agrees, that the district court was not required to dismiss John Doe to render its dismissal order final. We agree.

{14} "[O]ur appellate jurisdiction is limited to review of 'any final judgment or decision, any interlocutory order or decision which practically disposes of the merits

---

[1] Camarena also challenges the admissibility of deposition testimony concerning whether there were green tags on the scaffolding the day of the collapse, the grant of summary judgment regarding vicarious liability, and the grant of costs. Because we affirm the district court's grant of summary judgment on the *Delgado* issue, we need not address Camarena's arguments regarding evidence, vicarious liability, or costs.

of the action, or any final order after entry of judgment which affects substantial rights.'" *Capco Acquisub, Inc. v. Greka Energy Corp.*, 2007-NMCA-011, ¶ 17, 140 N.M. 920, 149 P.3d 1017 (quoting NMSA 1978, § 39-3-2 (1966)). Generally, "an order or judgment is not considered final unless all issues of law and fact have been determined and the case [is] disposed of by the trial court to the fullest extent possible." *Kelly Inn No. 102, Inc. v. Kapnison*, 1992-NMSC-005, ¶ 14, 113 N.M. 231, 824 P.2d 1033 (internal quotation marks and citation omitted). Finality in this case is affected by Rule 1-054(B) NMRA, which states that "any order or other decision . . . that adjudicates . . . the rights and liabilities of fewer than all the parties, does not end the action for any of the claims or parties." The fact that John Doe was not considered in the order on ANI's motion for summary judgment does not prevent the decision of the district court from being final. We explain.

{15}    "Proper service of process is required before a court can exercise jurisdiction over a defendant and render a binding judgment." *Ortiz v. Shaw*, 2008-NMCA-136, ¶ 17, 145 N.M. 58, 193 P.3d 605; *see* Rule 1-001(B)(3) NMRA (defining "process" as "the means by which jurisdiction is obtained over a person to compel the person to appear in a judicial proceeding"). John Doe was never properly served and never voluntarily appeared in the case, thus the district court never properly exercised jurisdiction over him and there was never a claim pending against him. An order dismissing him prior to an entry of the order on ANI's motion for summary judgment

was unnecessary. This result tracks the approach of the federal courts in determining finality regarding unserved defendants pursuant to Fed. R. Civ. P. 54(b)—which is substantially similar to Rule 1-054(B). *See Bristol v. Fibreboard Corp.*, 789 F.2d 846, 847-48 (10th Cir. 1986) (per curiam) ("These unserved defendants were never made parties to this lawsuit. It was not necessary for the district court to enter an order dismissing them prior to its entry of the order and judgment [from which the appeal was taken]."). Because of this, even though John Doe remains named in the caption, in looking to the "substance and not its form," *see Kelly Inn No. 102, Inc.*, 1992-NMSC-005, ¶ 15, the decision of the district court granting ANI's motion for summary judgment was final.

**II.     *Delgado* Claim**

**A.     Standard of Review**

{16}     "Summary judgment is reviewed on appeal de novo." *Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 8, 139 N.M. 12, 127 P.3d 548. We view the evidence in the light most favorable to Camarena, as the party opposing summary judgment. *See City of Albuquerque v. BPLW Architects & Eng'rs, Inc.*, 2009-NMCA-081, ¶ 7, 146 N.M. 717, 213 P.3d 1146. "In New Mexico, summary judgment may be proper when the moving party has met its initial burden of establishing a prima facie case for summary judgment." *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 10, 148 N.M. 713, 242 P.3d 280. "Once this prima facie showing has been made, the burden

shifts to the non-movant to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *Id.* (internal quotation marks and citation omitted).

{17} *Delgado* claims belong to a rare class of actions in which we require the district court to determine as a matter of law whether the circumstances of an occurrence and the conduct of a defendant are sufficiently aggravated to allow submission to the jury. *Morales v. Reynolds*, 2004-NMCA-098, ¶ 14, 136 N.M. 280, 97 P.3d 612. The importance and primacy of the exclusivity aspect of the WCA counsel in favor of allowing the district court a wider range of responsibility for winnowing the cases that may be allowed to proceed to trial in order to strike a more predictable balance of the interests of the employers and employees. *See id.* ¶¶ 15-16 (analogizing to the treatment of summary judgment motion in cases asserting intentional infliction of emotional distress claims). We are mindful that evaluation of the potential risk for injury, the employer's knowledge and appreciation of the risk, in light of the need to balance the intent of the parties, is of necessity a case and context specific endeavor.

**B.    Analysis**

{18}    The WCA generally provides the exclusive remedy for a worker when he or she suffers an accidental injury at work. NMSA 1978, § 52-1-9 (1973). In *Delgado*, our Supreme Court recognized the importance of the exclusivity provision in the

10

WCA and the benefits it provides to both employees and employers. 2001-NMSC-034, ¶ 12. But, it also noted that to prevent abuse of those benefits by employees and employers, the WCA limits the availability of the benefits to "workers injured *by accident* arising out of and in the course of his or her employment." *Id.* ¶ 13 (alteration, internal quotation marks, and citation omitted). Our Supreme Court expressed concern over the imbalance of the potential for loss of WCA benefits: an employer could only lose the benefit of the bargain if its actions met the actual intent test, while workers could lose out if their injuries resulted from intoxication, willfulness, or intentional self-infliction. *Id.* ¶¶ 14-15, 17. To remedy this imbalance and to effectuate the provision of the WCA that stated it should not be construed to favor either employers or workers, our Supreme Court held that willful acts by an employer could also result in an employer's loss of immunity from tort liability. *Id.* ¶ 24.

{19} Under *Delgado*'s three-prong test, a worker is not limited to the WCA remedy if (1) he or she can establish that the employer engaged in an intentional act or omission without just cause that is reasonably expected to result in the injury to the worker—commonly referred to as the objective prong; (2) the employer expected the intentional act or omission to result in the injury—commonly referred to as the subjective prong; and (3) the intentional act or omission proximately caused the injury. *Id.* ¶ 26. Our Supreme Court's reassessment of the commonly accepted actual

intent rule was presumably prompted by the particularly horrific facts in *Delgado*.
This Court summarized those facts in *Morales* as follows:

> The worker was employed at a smelting plant that distilled copper ore by heating rock to temperatures greater than 2,000 degrees so that usable ore would separate from unusable slag. [*Delgado*, 2001-NMSC-034,] ¶ 3. The slag drained into a 15-foot tall, 35-ton iron cauldron known as a "ladle," which workers would ordinarily empty on a regular basis by using a "mudgun" to stop the flow of molten slag long enough for a specialized device called a "kress-haul" to remove the ladle. *Id.* On the night that [the plaintiff employee] died, the work crew was shorthanded and was under pressure to work harder to recoup recent losses. *Id.* ¶ 4. The ladle was filling at an unusually fast pace and had reached the point where it would normally need to be emptied, but the mudgun was not working. *Id.* Although the employer's supervisors had the option of shutting down the furnace in order to stop any more molten slag from accumulating in the ladle while the workers emptied it, they did not. *Id.* Instead, they ordered [the plaintiff employee] to remove the ladle of molten slag using the kress-haul alone, despite the fact that molten slag was continuing to accumulate in the ladle and spilling over its brim and despite the fact that he had never done such a task before. *Id.* When [the plaintiff employee] saw the situation, he radioed for help, explaining that he was neither qualified nor able to perform the removal task. *Id.* ¶ 5. [The plaintiff employee's] requests were denied. *Id.* He again protested and asked for help, and again his supervisors insisted that he perform the dangerous operation. *Id.* [The plaintiff employee] eventually came up from the tunnel "fully engulfed in flames" and sustained third-degree burns all over his body that led to his death. *Id.*

*Morales*, 2004-NMCA-098, ¶ 9.

{20} It is important to note that the appeal in *Delgado* was from an order of dismissal under Rule 1-012(B)(6) NMRA for failure to state a claim upon which relief can be granted. *Delgado*, 2001-NMSC-034, ¶ 7. Since our Supreme Court did not have a developed factual record, it appropriately accepted as true the facts

12

properly pleaded in the complaint. *See id.* ¶ 2; *see also Derringer v. State*, 2003-NMCA-073, ¶ 5, 133 N.M. 721, 68 P.3d 961 (noting that appellate courts accept "all well-pleaded factual allegations as true" when reviewing a motion to dismiss for failure to state a claim). Our Supreme Court did not provide any specific guidance as to types of conduct or circumstances necessary to allow a case to be submitted to a jury. *Delgado*, 2001-NMSC-034, ¶¶ 26-31. It certainly did not state—or even imply—that circumstances as aggravated as those present in *Delgado* were required to avoid dismissal as a matter of law. *Id.* After announcing the test, our Supreme Court simply remanded to the district court to apply the test articulated in the case. *Id.* ¶ 32.

{21} Nevertheless, the facts detailed in *Delgado* have served as a touchstone against which the circumstances in later cases have been compared. As this Court stated in *Morales*, "plaintiffs must plead or present evidence that the employer met each of the three *Delgado* elements through actions that exemplify a comparable degree of egregiousness as the employer in *Delgado* in order to survive a pre-trial dispositive motion." *Morales*, 2004-NMCA-098, ¶ 14. This Court has noted in several cases that "[o]ur Supreme Court's decision in *Delgado* stems from this egregious employer conduct: a combination of deadly conditions, profit-motivated disregard for easily implemented safety measures, complete lack of worker training or preparation, and outright denial of assistance to a worker in a terrifying situation."

13

*Id.* ¶ 10; *Dominguez v. Perovich Props., Inc.*, 2005-NMCA-050, ¶ 15, 137 N.M. 401, 111 P.3d 721 (quoting *Morales*, 2004-NMCA-098, ¶ 10); *Chairez v. James Hamilton Constr. Co.*, 2009-NMCA-093, ¶ 30, 146 N.M. 794, 215 P.3d 732 (quoting *Morales*, 2004-NMCA-098, ¶ 10); *May v. DCP Midstream, L.P.*, 2010-NMCA-087, ¶ 8, 148 N.M. 595, 241 P.3d 193 (quoting *Morales*, 2004-NMCA-098, ¶ 10); *Richey v. Hammond Conservancy Dist.*, 2015-NMCA-043, ¶ 14, 346 P.3d 1183 (quoting *Morales*, 2004-NMCA-098, ¶ 10).

{22}     Camarena argues that the district court misapplied and misused the facts in *Delgado* when it measured the circumstances here. ANI, of course, disagrees. Part of our analysis will examine anew what kind of circumstances may be sufficient to allow a *Delgado* claim to avoid dismissal as a matter of law.

{23}     Our appellate courts first addressed the new willfulness test in *Morales*, which included the first cases "to reach us from what appears to be a growing pool of *Delgado* claims" that "highlight[ed] the need to determine whether an accident meets the requirements of *Delgado* as a matter of law." *Morales*, 2004-NMCA-098, ¶ 10. In *Morales*,[2] the plaintiff employee was fixing a pump that carried a chemical from a storage tank to a mix head. *Id.* ¶ 2. While the employee was fixing the pump,

---

[2]*Morales* resolved two cases from the district courts. *Id.* ¶ 1. Here, we outline only the case that was resolved at the summary judgment stage. *See id.* ¶¶ 19-24.

14

some of the chemical was released, causing the plaintiff employee's protective hood to pop up, ultimately resulting in the plaintiff's personal injury. *Id.*

{24} This Court held the defendant employer made a prima facie showing that its actions did not meet the objective or subjective prongs of the *Delgado* test for several reasons. *Id.* ¶ 20. First, there was no issue of worker inexperience because the plaintiff employee had done the same job and used the same equipment six to twelve times before. *Id.* Second, the defendant employer countered a potential attack on the safety equipment with testimony from the plaintiff employee that he had never been told to not change his protective hood and not use standard safety procedures, and he did not remember if he followed standard safety procedures that day. *Id.* Third, the defendant employer also presented testimony from another employee that he was unaware of pressure to get the job done quickly, and that another safety device was available but not preferable. *Id.* The plaintiff employee presented evidence that his safety hood had popped off on other occasions, he had suggested the employer do repairs on the other safety equipment (but he had not used that equipment in the incident), and he presented evidence the defendant employer knew the chemical was a dangerous chemical. *Id.* ¶ 22. This Court concluded that these circumstances were not sufficient to create a genuine issue of material fact regarding either the subjective or objective prongs of the willfulness test, though we did not distinctly analyze each prong of the test. *Id.* ¶ 23. We instead reasoned that neither the presence of a

15

dangerous chemical alone nor the availability of other, better safety equipment was sufficient to show employer willfulness. *Id.* Further, we considered that the defendant employer considered their actions and made a rational choice based on a number of factors. *Id.*

{25} This Court next addressed *Delgado* in *Dominguez*, 2005-NMCA-050.[3] In *Dominguez*, the plaintiff employee worked at the defendant employer's gravel processing operation. *Id.* ¶ 2. The plaintiff employee's job was to operate a front end loader by feeding raw gravel and rock material into screening equipment, which needed to be cleaned from time to time. *Id.* During the incident at issue, the plaintiff employee was performing the routine maintenance task of cleaning the screens, when the defendant employer's supervisor turned on the machine, which lead to the plaintiff employee being carried down a conveyor belt and getting injured. *Id.* ¶¶ 2-3.

{26} We concluded that "[the p]laintiff has failed to measure [the e]mployer's conduct up to the employer's conduct in *Delgado*." *Id.* For the objective prong, this Court noted that the plaintiff employee was performing a routine task, "a task with which he was familiar and he has performed in the past," and there was no inherent probability of injury. *Id.* ¶ 21. This Court noted that though it could be foreseeable

---

[3]Many of the facts alleged by both parties in *Dominguez* were unsupported in the briefing. *Id.* ¶¶ 2-4.

16

that another employee would negligently start the equipment, "such foreseeability does not rise to the level contemplated under the first prong of the *Delgado* test." *Id.* For the subjective prong, this Court noted that the plaintiff employee did not show a "modicum of intent on [the e]mployer's part to send [the p]laintiff into harm's way" and the intentional failure to provide safety devices did "not reach the standard contemplated under the second prong of the *Delgado* test." *Id.* It noted that the general failure to provide safety devices "was not in and of itself a probable injury for [the p]laintiff on the occasion in question." *Id.*

{27}     The crux of the decision in *Dominguez* was that our "Supreme Court in *Delgado* intended more than the disregard of preventative safety devices as occurred in the present case" to meet the willfulness standard. *Id.* ¶ 22. This Court determined that a failure to provide safety devices is not a situation where "the employer has specifically and wil[l]fully caused the employee to enter harm's way, facing virtually certain serious injury or death, as contemplated under *Delgado*." *Id.* ¶ 22. This Court concluded that the critical measure "is whether the employer has, in a specific dangerous circumstance, required the employee to perform a task where the employer is or should clearly be aware that there is a substantial likelihood the employee will suffer injury or death by performing the task." *Id.* It was clear that the possibility "that an accident might occur because of an unexpected careless act of a co-employee does not meet the *Delgado* standard." *Id.*

17

{28}     The last reported case in which this Court addressed *Delgado* in the summary judgment context was *May*, 2010-NMCA-087. In *May*, the plaintiff employee worked at a facility that received gas pipe inspection gauges (pig) that were sent through pipeline to clean buildup. *Id.* ¶ 2. The defendant employer's pig receiver was modified to accept a "smart" pig, which was ten feet long and weighed approximately eight hundred pounds. *Id.* The plaintiff employee, a plant operator, was tasked with retrieving the pig, but due to the modification he was unaware that there was two hundred fifty pounds of pressure from behind the pig. *Id.* ¶ 3. The pig became dislodged while the plaintiff employee was working in front of the receiver opening and the pig struck him at ninety miles per hour resulting in significant personal injuries. *Id.*

{29}     In *May*, the plaintiff employee based his argument on an internal investigative report that established that workers were unable to determine where the pig was in the receiver or if pressure was trapped behind the pig, they were unable to relieve any pressure trapped behind the pig, the personnel lacked fundamental understanding of operating the pig receiver, and the training the plaintiff employee received was for the original receiver, not the reconfigured receiver. *Id.* ¶ 10.

{30}     This Court affirmed the grant of summary judgment in favor of the defendant employers but did so without explicitly analyzing each prong of the test. *Id.* ¶¶ 12-15. Regarding the objective prong, this Court determined that the plaintiff employee

18

was performing a routine task on unsafe equipment that he had performed before, which was not the same as sending an employee to face certain injury. *Id.* ¶¶ 12-13. Regarding the subjective prong, this Court noted (1) there was no proof the employers' "decision to keep the [pig] in its modified state was profit-motivated in disregard for safety"; (2) the absence of safety measures did not show an intent; and (3) although the defendant employers allowed a negligently dangerous condition to persist, there was no indication that in leaving the pig in the reconfigured state, they knew or expected the plaintiff's injuries to occur. *Id.*

{31}     The crux of the conclusion was that though the employer defendants "were negligent, perhaps even grossly negligent, . . . negligence is not enough." *Id.* ¶ 15. This Court concluded the evidence did not "create material issues of fact for a jury to decide whether [the employer d]efendants' actions and omissions exemplif[ied] a comparable degree of egregiousness as the employer in *Delgado*." *Id.* ¶ 12.

{32}     As we reexamine the willfulness test, we note our agreement with the outcome in each of these cases. It was relatively easy to conclude in *Morales* and *Dominguez* that the facts adduced constituted run-of-the-mill employment hazards that did not meet the *Delgado* objective prong and thus did not call for a judicial response outside the WCA. *See Morales*, 2004-NMCA-098, ¶ 23; *Dominguez*, 2005-NMCA-050, ¶ 21. Comparison to the situation in *Delgado* was in a practical sense not necessary to decide the cases other than to acknowledge the seminal case in the area. *May*

presents us a more difficult issue from the standpoint of the objective test. *See* 2010-NMCA-087. The danger posed by the modified pig would likely allow the physical circumstance to be submitted to a jury to determine if it met the *Delgado* standard for egregiousness. *Id.* ¶¶ 2-3. The combination of an eight hundred-pound projectile subject to an unknown but likely dangerously high amount of pressure might meet the objective *Delgado* prong. *Id.* But, there was no evidence of the employers' knowledge or callousness to the danger posed, and, thus, the subjective prong could not be met. *Id.* ¶¶ 11, 13-14. The cases illustrate the cautious approach this Court has taken to protect WCA exclusivity as we attempt to balance the interests of workers and employees. We now turn to the present case.

{33}     A question before us is whether the same level of horrific circumstance and egregious employer conduct found in *Delgado* is *required* to establish willfulness. Stated another way, does a "comparable degree of egregiousness" *require* the "combination of deadly conditions, profit-motivated disregard for easily implemented safety measures, complete lack of worker training or preparation, and outright denial of assistance to a worker in a terrifying situation"? *See Morales*, 2004-NMCA-098, ¶¶ 10, 14. In short, have these metrics morphed into elements of a *Delgado* claim? And finally, if the matter does not require a combination of those exact conditions, do the circumstances here meet the *Delgado* test? We address the first question before moving to the facts of this case.

{34} We start by noting that the district court appears to have treated the four descriptors listed above as elements. It quoted the list from *Morales* in its opinion and order and then used them as a guide for its analysis. And, ANI explicitly argues that the *Morales* summation of the circumstance in *Delgado* represents elements of the test and that there can be no *Delgado* claim unless the facts in each case are as aggravated and horrific as those in *Delgado*.

{35} While *Morales* can be read to support ANI's position, the Court in *Morales* was clearly concerned about what appeared "to be a growing pool of *Delgado* claims" and the potential for disruption of the well-established system under the WCA for compensation of on-the-job injuries. *Id.* ¶¶ 10, 14-16. That concern continues unabated, but we conclude that the cases following *Morales* have improperly conflated the language in paragraph ten describing the factual setting of *Delgado* with the general language of paragraph fourteen requiring plaintiffs to "plead or present evidence that the employer met each of the three *Delgado* elements through actions that exemplify a comparable degree of egregiousness." *Id.* ¶¶ 10, 14.

{36} *Morales* started its analysis by quoting the three-prong test formulated in *Delgado*. *Id.* ¶ 8. It then noted that, "[b]eyond this test, the Court did not elaborate on the boundaries of what type of conduct qualifies under the exception to exclusivity." *Id.* ¶ 9. The *Morales* opinion summarized the facts plead in *Delgado*, and distilled those facts down to four categories of circumstances that ANI argues

are elements of a *Delgado* claim, which have to be present in every case. *See id.* ¶¶ 9-10.

{37} The difficulty with this interpretation of *Morales* is twofold. First, the language in paragraph ten is on its face no more than a reflection of the situation in *Delgado*. *Id.* ¶ 10. The opinion in *Morales* does not state that these facts are required in every case in order for a viable *Delgado* claim to be asserted. *Id.* Rather, in paragraph fourteen, *Morales* refers back to the general three-prong test set forth in *Delgado* and requires "comparable"—not exact—evidence of egregiousness. *Id.* ¶¶ 8, 14.

{38} Second, to treat the descriptive factors of paragraph ten as elements of the willfulness test would limit *Delgado* claims to circumstances essentially identical to the type of facts present there. *See id.* ¶ 10. We see no policy need to limit the potential relief recognized by our Supreme Court to situations that border on the criminal. That interpretation would tend to push the balance sought by the Court back to the actual intent test it specifically rejected. *See Delgado*, 2001-NMSC-034, ¶ 23. A more nuanced approach is to take the factors into account as appropriate given the factual setting of each case. *See Morales*, 2004-NMCA-098, ¶ 10. One or more of the factors might not be relevant depending on the factual circumstances presented. For example, in this case, failure to give aid in a terrifying situation would not apply simply because there would have been no time to do so in the face of the

sudden collapse of the scaffolding. This approach preserves the concededly high bar needed to prove willfulness under *Delgado*. *See id.* ¶ 14. By doing so, we also preserve the exclusivity of the WCA for almost all on-the-job injuries.[4] We now turn to the facts of this case.

{39} We start with the objective prong. ANI asserts that block on the scaffolding was a normal condition. It asserts Camarena presented no objective evidence the scaffolding was overloaded, and the scaffold was green tagged, so it makes a prima facie showing that there was no action that was "reasonably expected to result in the injury." *See Delgado*, 2001-NMSC-034, ¶ 26. ANI argues that Camarena "was performing the routine job of applying waterproof membrane to the building he had been [working on for two and a half] months." (Emphasis omitted.) ANI notes Camarena was an experienced journeyman and his safety training courses included scaffolding training. The district court and ANI also point to the testimony that workers on the project saw green tags. The green tag evidence is relevant in that they saw the green tag, but we note that no one testified that the green tag contained the proper date. Finally, ANI notes there is no evidence that Camarena objected to or expressed concern about working on the scaffolding. *See Chairez*, 2009-NMCA-093, ¶ 32 (noting it was the plaintiff employee's own choice that placed him in

---

[4]To the extent that *Threadgill v. 6001, Inc.*, A-1-CA-34785, mem. op. ¶ 13 (N.M. Ct. App. Jul. 2, 2018) (nonprecedential), conflicts with our holding, it is overruled.

harm's way, unlike "in *Delgado*, where the employer ordered the worker into a molten inferno despite the worker's protestations"). While each of these assertions are true, ANI wholly disregards the evidence that demonstrates how dangerous the overloaded scaffolding was.

{40} Sixteen tons of masonry block were stacked among sixteen different levels of untethered scaffolding that was six stories and approximately ninety-five feet high. The scaffolding was overloaded by two to four times its capacity. This is a specific dangerous circumstance where a jury could reasonably find that there was a substantial likelihood that workers on the scaffold would suffer injury or death. *See Dominguez*, 2005-NMCA-050, ¶ 22 ("The critical measure . . . is whether the employer has, in a specific dangerous circumstance, required the employee to perform a task where the employer is or should clearly be aware that there is a substantial likelihood the employee will suffer injury or death by performing the task."). A jury could also find that the overloaded scaffolding presented a situation with an "inherent probability of injury." *See id.* ¶ 21. Thus, we conclude that the objective test has been satisfied by Camarena.

{41} We next move to the subjective prong. Camarena's complaint alleged that at all relevant times, ANI and its employees and agents had notice of a dangerous condition with respect to the scaffolding, but despite such notice, ANI willfully, wantonly, and intentionally disregarded a known risk and danger and directed its

24

workers, including Camarena, to perform work on the scaffold. ANI moved for summary judgment, arguing Camarena provided no evidence that Garcia, Gomez, or any other ANI employee knew that the scaffold had been overloaded beyond its capacity, and that, to the contrary, they knew—albeit not precisely when—the scaffold had been green tagged as safe for use. ANI argued Camarena was an experienced journeyman with training in scaffold security, who never objected to working on the scaffold. This evidence is sufficient to establish a prima facie case in favor of ANI with regard to the subjective intent prong of the *Delgado* test. It facially demonstrated that ANI did not know the scaffold had been overloaded by the Stone Cold employees, and, thus, it could not have the subjective intent required to prove the willfulness that *Delgado* provided.

{42}   It was Camarena's burden to show that there was a genuine issue of material fact as to whether ANI was on notice of the dangerous condition of the scaffold. *See Morales*, 2004-NMCA-098, ¶ 14. Camarena argues that testimony from multiple Stone Cold employees that they saw the block on the scaffolding creates a genuine issue of material fact on the subjective inquiry, because it demonstrates ANI knew or should have known that the scaffolding was overloaded.

{43}   Even viewing the evidence in the light most favorable to Camarena as the nonmoving party, *see Knapp v. Fraternal Order of Eagles*, 1987-NMCA-064, ¶ 7, 106 N.M. 11, 738 P.2d 129, and assuming this testimony demonstrates that Garcia

25

and Gomez must have seen the block on the scaffolding, Camarena fails to create a question of fact as to whether ANI "expect[ed] the intentional act or omission to result in the injury, or . . . utterly disregarded the consequences." *See Delgado*, 2001-NMSC-034, ¶ 26. There is no testimony that Garcia and Gomez knew how much block had been loaded onto the scaffolding or how much it weighed. Similarly, there is no testimony that they knew the design load capacity of the scaffolding. The testimony regarding the general knowledge on the construction site indicated that no one on the site understood the danger created by the block weight. There was no testimony from Les File employees concerning the capacity or limits of the scaffolding they erected. The Stone Cold employees who placed the block on the scaffolding believed there was no problem connected to the weight they placed. Camarena did not present any evidence that anyone raised concerns about the weight of the block at the regular planning and safety meetings held on the site. If the other trades and subcontractors on the job did not appreciate the danger, it is difficult to see how culpable knowledge could be attributed to ANI.

{44} Garcia testified that, if Stone Cold employees had loaded block on the scaffold, he would only allow his employees on the scaffolding if there was "an extremely small amount [of block] placed out of the way of [his employees'] path of travel." Garcia clarified that it would have to be less than five blocks on the scaffolding. He did not explain why he would not allow his employees on the

26

scaffolding in such a situation. Thus, it is simply unknown if his concern was at all related to the weight of the blocks or the capacity of the scaffolding.

{45} Camarena's expert testified ANI probably should have known the load capacity of the scaffolding, but there was no basis for his testimony. Garcia and Gomez did not testify about their knowledge concerning the load capacity of scaffolding in general or this scaffolding in particular. And, as noted above, there was no indication in the record that anyone on the job knew or suspected that the scaffolding had been dramatically and dangerously overloaded.

{46} The evidence does not demonstrate that ANI "utterly disregarded the consequences" of its choice to send Camarena up on the overloaded scaffolding. *See id.* Camarena simply presents no evidence that a reasonable jury could infer that ANI had specific knowledge about the danger or disregarded the consequences of a dangerous situation.

{47} As Camarena did not meet the subjective prong of the willfulness test, the district court did not err in granting ANI's motion for summary judgment on his *Delgado* claim.

**III.    Sanctions**

{48} In its answer brief to this Court, ANI referred to Camarena's settlements with other parties—parties not part of this litigation—related to the incident that gave rise to this case. After the answer brief was filed, Camarena filed a motion, pursuant to

27

Rule 12-309 NMRA and Rule 12-314(D) NMRA, to seal an unredacted version of a motion for sanctions it intended to file, that directly quoted ANI's reference to the settlement figures. Without explanation, this Court denied the motion. Plaintiff filed an unredacted motion for sanctions that referenced the information but did not quote the objectionable material.

{49} Camarena argues ANI violated the rules of appellate procedure by referencing information that is not in the record proper, and the rules of professional conduct by disclosing confidential information when it referred to the settlement amounts. Camarena requests an award of reasonable attorney fees and costs for the filing of its motion for sanctions, a monetary fine, that we strike ANI's answer brief, and that we order ANI to file an amended answer brief that excises the reference to that information but that is otherwise identical to the answer brief currently on file. In response, ANI requested this Court deny the motion and award ANI its attorney fees in responding to the motion. We decline to grant Camarena's motion and ANI's request. We explain.

{50} We start by noting that ANI mentioned the information Camarena objects to in multiple pleadings to the district court. This is relevant to two distinct but overlapping parts of our analysis. First, Camarena's argument is simply too late. He did not address the statements or attempt to remove the information from the record below. As it did not merit attention in the district court and the circumstances have

not changed, Camarena tacitly established that it was not an issue worth pursuing. Granting Camarena's motion for sanctions now would ignore the multiple opportunities he had to establish ANI's wrongdoing, but failed to pursue. Second, because the information is mentioned throughout the record, Camarena fails to establish any prejudice to ANI's reference to the settlement in its briefing to this Court. The information is irrelevant to our analysis and does not make a difference to the outcome of the proceedings. Camarena does not establish the reference harmed or prejudiced him sufficiently that it would warrant sanctions.

{51}     Although referencing the settlement amount may be a technical violation of the rules, granting sanctions for such a violation is a discretionary act. Based on the foregoing analysis, we decline to impose sanctions on ANI. We also deny ANI's request for attorney fees for responding to the motion.

{52}     **IT IS SO ORDERED.**


_____

**MICHAEL D. BUSTAMANTE, Judge, retired, sitting by designation.**

**WE CONCUR:**


_____

**J. MILES HANISEE, Judge**


_____

**JACQUELINE R. MEDINA, Judge**